**UNITED STATES of America, Appellee,**

v.

**William Helbert DIEZ and Hernando Palaus, Appellants.**

**Nos. 1045, 1046, Dockets 83–1402, 83–1457.**

United States Court of Appeals, Second Circuit.

Argued April 3, 1984.

Decided June 1, 1984.

Howard L. Baker, New York City (Wilens & Baker, New York City, of counsel), for appellant Diez.

Peter J. Fabricant, New York City, for appellant Palaus.

Peter J. Tomao, Asst. U.S. Atty., Brooklyn, N.Y. (Raymond J. Dearie, U.S. Atty., E.D.N.Y., L. Kevin Sheridan, Asst. U.S. Atty., Brooklyn, N.Y., of counsel), for appellee.

Before FEINBERG, Chief Judge, OAKES, Circuit Judge, and POLLACK, District Judge.[*]

OAKES, Circuit Judge:

This appeal is from convictions in what in the annals of this court can only be termed a run-of-the-mill drug case. Appellants Hernando Palaus and William Helbert Diez were each convicted in the United States District Court for the Eastern District of New York, John R. Bartels, Judge, of one count of conspiracy to distribute cocaine (21 U.S.C. § 846) (1982) and one count of possession of cocaine with intent to distribute (21 U.S.C. § 841(a)(1) (1982); 18 U.S.C. § 2 (1982)). Appellant Palaus was also convicted of possessing a weapon during the commission of a felony (18 U.S.C. § 924(c) (1982)). Diez received concurrent sentences of five years on each count plus a special parole term of ten years, while Palaus received concurrent sentences of eight years plus a similar special parole term. On appeal Diez argues that there was insufficient evidence to support his conviction of conspiracy. Diez also argues that the trial judge erroneously conducted the initial voir dire of prospective jurors, erroneously failed to disqualify a prejudiced juror and declare a mistrial and erroneously charged the jury with respect to his "mere presence" at the scene of the crime. Palaus, in addition to adopting some of Diez's arguments, argues that the admission into evidence of Diez's post-arrest statement, even though redacted and accompanied by limiting instructions, violated Palaus's right of confrontation and thus constituted reversible error. Palaus also argues that the trial judge should have immediately inquired into the alleged juror misconduct rather than waiting until after the jury had finished deliberating. We affirm.

---

[*] Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

## FACTS

On June 6, 1983, government informant Eduardo Flores met with one Carlos Villegas at the Iberia Bar in Queens and indicated to Villegas that he was interested in buying a kilogram of cocaine. As a result of that meeting a purchase was arranged at the price of $50,000, involving Villegas and two friends, Fernando Patino and Juan Gutierrez. The deal was set for the evening of June 9 at the El Dorado restaurant, also in Queens.

At the appointed time, Flores, accompanied by an undercover New York City police detective, drove to the El Dorado. Flores then entered the restaurant and met with Gutierrez. Patino, who was sitting at the bar, then left the restaurant, and returned with one-eighth of a kilogram of cocaine which he showed to Flores. After Flores agreed to make the purchase, Patino told him that the rest of the cocaine was "on its way." Patino then placed a phone call and discussed the deal with a person on the other end of the line, and permitted Flores to speak to the person who reportedly said he would be bringing "that" in about twenty-five or thirty minutes. After the phone call Patino told Flores that a Cadillac would arrive and beep its horn, and that would be "the man who is bringing the kilo."

At about 1:00 a.m. surveillance agents saw the Cadillac, later found to contain Palaus and Diez, drive very slowly past the restaurant and then return and sound its horn twice. Within a few seconds after the "beep," Patino told Flores that "the man is here." Patino then ran outside the bar, entered his own automobile and followed the Cadillac to a deserted street.

Patino, who was, of course, under surveillance, then got out of his car and walked to the driver's side of the Cadillac, where he picked up a plastic bag later found to contain the kilogram of cocaine. Patino then returned to the restaurant and gave the bag to Flores. Moments later task force members entered the restaurant and arrested Gutierrez and Patino.

Meanwhile, surveillance of the Cadillac continued. After some slow driving about, the car containing appellants pulled into a deserted, unlighted gasoline station where it waited for several minutes and then returned toward the El Dorado. By that time, the agents conducting the surveillance learned of the arrests inside the restaurant, and they blocked the Cadillac when it stopped at a stop light. Palaus, the driver, and Diez, the passenger, were placed under arrest, and a detective seized from the front seat of the automobile a black leather bag containing a loaded .38 caliber revolver, some papers including a receipt for a large sum of money bearing Palaus's name, a piece of paper containing the name "Fernando" and the telephone number of the El Dorado, a business card of the El Dorado, and a small amount of cocaine.

The detective who took Diez back to the DEA office advised him of his rights, and Diez then told him that he had nothing to do with what had transpired, that he had met Fernando Patino for the first time the previous day and had agreed to meet him at the El Dorado restaurant for dinner and drinks. Diez stated that Patino asked him to go to the vicinity of Queens Boulevard between 73rd and 74th Streets to pick up another individual and bring him back to the El Dorado. Diez said that he did so and returned to the vicinity of the El Dorado restaurant at which time he was arrested.

As part of his statement to the detective, Diez also identified Palaus, although not by name, as the individual whom he had met. He also identified the car as a Cadillac, and stated that Patino asked him to let Palaus drive the Cadillac back to the restaurant. These portions of Diez's statement were redacted when it was read to the jury, after objections by Palaus under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

## DISCUSSION

■ 1. *Sufficiency of the evidence.* Diez argues that the evidence offered at

trial established only his physical presence in the Cadillac, that he knew Patino, and that Patino asked him to pick up an unknown person and return to the El Dorado Restaurant. He insists that this evidence constitutes proof of no more than "mere presence" and perhaps "mere association" with one of the conspirators. He relies on the cases in our circuit including, *e.g., United States v. Johnson*, 513 F.2d 819, 823–24 (2d Cir.1975), to the effect that mere presence at the scene of a conspiratorial act is not sufficient to sustain a conspiracy conviction without proof of "purposeful behavior" tending to connect the defendant with the purchase, concealment, importation, use, or sale of drugs, i.e., without proof of a deliberate, knowing, specific intent to join the conspiracy. Mere association with a guilty party is not enough to establish such purposeful behavior. *Id.* at 824. Conceding that circumstantial evidence may be used to prove membership in a conspiracy, *United States v. Sanzo*, 673 F.2d 64, 69 (2d Cir.), *cert. denied*, 459 U.S. 858, 103 S.Ct. 128, 74 L.Ed.2d 111 (1982), Diez maintains that the circumstantial evidence here was insufficient to prove his guilt beyond a reasonable doubt, especially since the record nowhere makes reference to him as a participant in the conspiracy.

We agree with the Government, however, that while the evidence was not overwhelming, it was not insufficient as a matter of law to sustain the conviction. *See United States v. Terrell*, 474 F.2d 872, 876 (2d Cir.1973). Diez was present in the Cadillac from which Patino picked up the kilogram of cocaine. This alone distinguishes this case from *United States v. Steward*, 451 F.2d 1203, 1206–07 (2d Cir.1971), where an armed driver of a car which carried a drug seller and his wares to a motel where the sale took place had his conviction for aiding and abetting reversed for insufficient evidence. Here, Diez actually witnessed the transaction.

Moreover, while Diez did not own the Cadillac, he at least had sufficient control over it such that he drove it and, at Patino's request, picked up Palaus and then permitted Palaus to drive the vehicle from which the drugs were taken. This case is like *Mack v. United States*, 326 F.2d 481 (8th Cir.), *cert. denied*, 377 U.S. 947, 84 S.Ct. 1355, 12 L.Ed.2d 309 (1964), in that Diez was in attendance at the delivery of the product, provided the means of transportation, and, for a certain extent of time, operated the vehicle involved. Moreover, Diez's statement that he intended to meet Patino that night for dinner and drinks could certainly be taken by the factfinder to be a false exculpatory statement, since he arrived near the restaurant after 1:00 a.m., at a time when it was vacant except for Patino, Gutierrez, Flores, and a bar maid. Beyond this, the Cadillac did pass by the restaurant twice before the delivery, signaling Patino with its horn. He then followed it to the deserted street where delivery of the bag was made, Diez sitting in the front seat so as to see it. The driving pattern thereafter—going very slowly, using the deserted gasoline station for a few minutes' stop and to make a U-turn—permits the inference that Diez and Palaus were simply killing time so that the deal could be completed before they returned to the restaurant to share in the proceeds.

2. *Voir dire.* The rather novel argument made as to the judge's conduct of the voir dire concerns the fact that certain questions were asked of a group of over thirty prospective jurors seated in the general seating area of the courtroom. The court's procedure involved asking the prospective jurors to raise their hands if the questions applied, and this, it is argued, "made it impossible for defense counsel to follow the responses of the prospective jurors and to be able to make a knowing and meaningful challenge to any juror." But an examination of the transcript of the voir dire indicates that the only questions asked generally of the entire panel related to their knowledge of either counsel or defendants and whether "any member of the jury or a member of his family [is] employed as a law enforcement officer or in the office of a law enforcement agency." In response to the latter question, the

judge made sure that the record noted the names of those jurors who responded affirmatively. Evidently no panel member raised his or her hand when asked whether he or she knew any of the counsel or defendants. Thereafter the jurors were individually seated in the jury box, and counsel was provided an opportunity to ask additional questions. Appellants' argument regarding the voir dire is thus utterly without substance.

We note additionally that Fed.R.Crim.P. 24(a) permits the trial judge to conduct the voir dire, though he need not do so, and other courts have held that the judge may question the jurors as a group. *E.g., United States v. Giese,* 597 F.2d 1170, 1183–84 (9th Cir.), *cert. denied,* 444 U.S. 979, 100 S.Ct. 480, 62 L.Ed.2d 405 (1979). Moreover, any objections to the nature and extent of voir dire not made before the commencement of testimony are treated as waived. *United States v. DeFiore,* 720 F.2d 757, 765 (2d Cir.1983). Thus, not only was the procedure used by Judge Bartels entirely unobjectionable—and appellants furnish us with no authority supporting their claim otherwise—but no timely objection was made. The point is frivolous.

■ 3. *The instructions as to the defense theory of "mere presence."* Diez claims that the court erred by refusing to give the "mere presence" charge which he requested. However, the court did instruct the jury that "mere presence at the scene of the crime or mere knowledge that the crime is being committed is not sufficient to convict a defendant." Other instructions actually given and bearing on the point are set out in the margin.[1] Taken as a whole, the conspiracy charge was thor-

oughly satisfactory, *see United States v. Kelly,* 349 F.2d 720, 760 (2d Cir.1965), *cert. denied,* 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966), and fully accounted for the proposition that a defendant is entitled to an instruction on his theory of the case if the request is timely, supported by evidence, legally sufficient, and clearly defined. *United States v. Burke,* 700 F.2d 70, 81 (2d Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 72, 78 L.Ed.2d 85 (1983).

■ 4. *Diez's post-arrest statement. Bruton v. United States* held that "in the context of a joint trial we cannot accept limiting instructions as an adequate substitute for petitioner's constitutional right of cross-examination." 391 U.S. 123, 137, 88 S.Ct. 1620, 1628, 20 L.Ed.2d 476 (1968). Palaus's argument is that despite the deletion from Diez's post-arrest statement of the identification of Palaus as the person he picked up, nevertheless the jury readily and clearly would infer that Palaus was that person, since Palaus was the only other person in the car with Diez. Once that inference was drawn and the proof adduced that Patino had obtained a bag of cocaine from the Cadillac, the statement served, it is argued, to show a connection between Palaus and Patino theretofore lacking, and so permitted the jury to infer that it was Palaus rather than Diez who possessed and delivered the cocaine.

We believe that the district court correctly held that the statement as redacted did not independently inculpate Palaus. *See United States v. Wingate,* 520 F.2d 309, 314 (2d Cir.1975), *cert. denied,* 423 U.S. 1074, 96 S.Ct. 858, 47 L.Ed.2d 84 (1976). According to the evidence, the Cadillac was under surveillance from the moment it

---

**1.** Mere similarity of conduct among various persons, and the fact that they may have associated with each other and may have assembled together ... does not necessarily establish proof of the existence of a conspiracy. Furthermore, a person who has no knowledge of a conspiracy, but happens to act in a way which furthers some object or purpose of the conspiracy, does not thereby become a conspirator

....

   Before the jury may find that a defendant, or any other person, has become a member of a

conspiracy, the evidence in the case must show beyond a reasonable doubt that the conspiracy was knowingly formed, and that the defendant ... willfully participated in the unlawful plan, with the intent to advance or further some object or purpose of the conspiracy. The mere presence of someone at a time and place when the conspiracy is being carried on, is not, without knowledge or intent to join the conspiracy, sufficient evidence to make him a member of the conspiracy.

drove past the El Dorado sounding its horn, and including the time when Patino met with it and obtained a bag from the driver's side. When the car was stopped by the police, Palaus was behind the wheel. It was his handbag from which was seized a loaded .38 caliber revolver, a business card containing the address of the El Dorado, and a piece of paper containing the notation "Fernando" and the telephone number for the El Dorado Restaurant. As the Government states, it was that evidence that connected Palaus to the crime, and not Diez's statement as redacted.

**■ 5. *Juror misconduct.*** Some ten hours after the jury began deliberating, the prosecutor brought to the court's attention that "over the break" he had learned that during the weekend recess of the trial one juror had had a conversation with Senior Investigator Lawrence McDonald, a New York State Trooper who, although assigned to the DEA task force, was not assigned to the case on trial. In this conversation, which had taken place in a neighborhood bar, the juror told McDonald that he had been assigned to a case in the Eastern District of New York in which Agent Palumbo and Detective O'Sullivan were witnesses. McDonald, asked if he knew these men, reportedly replied that they worked in the same office. This was the entire substance of the contact.

The revelation of this conversation came just after Judge Bartels had read a jury note suggesting that the jury was near a partial verdict. Over defense objections, Judge Bartels elected to defer any inquiry until after the verdict was decided and announced.

The verdicts came about one hour later. The judge then questioned the juror and permitted counsel to participate in the questioning. The juror stated that he knew McDonald. His version of the meeting was similar to that reported by the Assistant United States Attorney. The juror volunteered that he did not remember the conversation very clearly because he had been drinking too much. The judge found that the alleged misconduct was "nothing" and appeared to be "frivolous."

Appellants' objections go both to the timing of the inquiry conducted by the court as well as the substance. Both are matters within the exercise of a trial judge's sound discretion, however, and we do not believe that reversible error was committed. From appellate towers it would be easy to fault a trial judge for not having interrupted deliberations immediately and conducted an inquiry on the spot. Failure to do so in a given instance could lead to taint of the verdict which a prompt inquiry and warning might forestall, as in the case of an inflammatory news article read by one juror. In the present case, with the jury out as long as it had been and evidently nearing a partial verdict, the judge could well have thought that to interrupt deliberations on the strength of a juror's bar-type contact with an officer not connected with the case might create more difficulty than it would avoid. Perhaps the judge thought that the juror, to show his impartiality despite the contact, would stall the deliberations. From the description given of the contact by the Assistant United States Attorney, the judge may also have thought that there was so little likelihood of taint, especially after ten hours of deliberation in a straightforward case, that it was simply not worth an inquiry at that stage of the proceedings. Under the circumstances we cannot say that the judge abused his discretion, even though in the ordinary case it would probably be preferable to conduct a taint hearing as promptly as possible.

In terms of the substance of the hearing conducted by Judge Bartels, the Supreme Court has only recently reminded us, in a far more compelling context for finding taint, that a juror's testimony in this type of situation is not "inherently suspect." *Smith v. Phillips*, 455 U.S. 209, 217 n. 7, 102 S.Ct. 940, 946 n. 7, 71 L.Ed.2d 78 (1982) (citing *Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 523, 94 L.Ed. 734 (1950)). Here the juror had only a foggy memory that the contact had occurred at all, and his testimony was that the contact had been nothing other than what had been

represented by the Assistant United States Attorney. That the contact was disclosed promptly was, of course, appropriate, but it also weighs favorably toward the veracity of its recounting. While Judge Bartels could have called in the trooper to testify, that did not seem necessary to him and evidently was thought insufficiently important by counsel to make a point of it to us. Under the circumstances there was no abuse of discretion.

Judgment affirmed.