UNITED STATES of America, Appellee,

v.

Dominick MARTINO,
Defendant-Appellant.

No. 317, Docket 84–1215.

United States Court of Appeals,
Second Circuit.

Argued Oct. 22, 1984.

Decided April 3, 1985.

Paul K. Rooney, New York City (Daniel J. Ollen, Paul K. Rooney, P.C., of counsel), for defendant-appellant.

Roanne L. Mann, Asst. U.S. Atty., S.D. N.Y., New York City (Rudolph W. Giuliani, U.S. Atty. for S.D.N.Y., Barry A. Bohrer, Asst. U.S. Atty., of counsel), for appellee:

Before VAN GRAAFEILAND, PIERCE, and PRATT, Circuit Judges.

PIERCE, Circuit Judge:

This is an appeal from a judgment of conviction entered on June 1, 1984, against appellant after a four-day jury trial before

Judge Morris E. Lasker in the United States District Court for the Southern District of New York. Appellant was convicted of conspiring to distribute and possess with intent to distribute heroin in violation of title 21, United States Code, section 846. Appellant filed a timely notice of appeal. We affirm.

The government presented evidence to show the events hereinafter described. Francis "Butchy" Pugliese, a drug seller, arranged to buy narcotics from Thomas Mattio, his former prison acquaintance and former drug customer. Unknown to Butchy, Mattio, a previously convicted drug trafficker, was acting as a United States Drug Enforcement Agency ("DEA") informant and was assisting government agents in a "reverse undercover operation." In mid-July 1983, Mattio told Butchy he had a source which could provide five kilograms of heroin per month. Butchy stated that he could dispose of it. On or about July 22, 1983, Mattio told him that this quantity was available at $165,000 per kilogram—which Butchy found acceptable. Butchy introduced Mattio to co-defendant Ronald Ingrassia as one who would accept samples for him.

Toward the end of July 1983, Mattio spoke with Butchy from Florida by telephone and told him in code that his source had heroin to sell. Upon his return to the Bronx, Mattio met with Butchy and told him that his source had six kilograms to sell. Butchy answered that he knew several persons "who had a couple of million dollars," and, if absolutely necessary, he could "[get] rid of it" to "some guys on Buhre Avenue."

On or about August 2, 1983, Ingrassia, in the company of Mattio, received samples (stipulated to be on average 90 percent pure) at a motel in Tarrytown, N.Y. He delivered them to Butchy at an apartment near the intersection of Westchester Avenue and St. Paul's Avenue in the Bronx. Butchy took them away and in less than an hour returned and stated that the samples "checked out fine" but that the customer refused to release the purchase price without his partner's approval.

On August 5, 1983, Mattio went to a pre-arranged meeting in front of Bridge's Steak Pub in the Bay Terrace Shopping Center in Queens, and met with Butchy and Neal Ruggiero, another co-defendant and Butchy's prospective son-in-law. At this meeting, Butchy explained that he had encountered money problems and suspicion on the part of his prospective customers.

Butchy then proposed to Mattio an alternate plan: that Mattio would be paid $100,000 toward the $160,000 purchase price,[1] and give Butchy one kilogram of heroin. Butchy would owe $60,000 for the balance. He indicated that one-half of the kilo would go to one customer; from the other half he would take samples to show to some other possible customers. He stated that this remaining half-kilo he would dispose of "first come, first served."

On August 8, 1983, Mattio and Butchy met, as arranged, at the corner of Westchester and St. Paul's Avenue in the Bronx around 6:15 p.m. Neal Ruggiero arrived shortly thereafter and stated that he had just talked with some people who had money to purchase the heroin. At Mattio's insistence that they be "absolutely sure there was money available," Ruggiero arranged a meeting with the person who had the money, to take place in 15–20 minutes on Allerton Avenue, in the Bronx. Ruggiero departed. Mattio and Butchy drove to Allerton Avenue together; a few minutes later, Ruggiero arrived and stated that a person with "a bag full of money" was in a car around the corner. Butchy walked around the corner to verify this; he then returned to Allerton Avenue and told Mattio that he had seen "a bag full of money." Mattio stated, "Okay. I'll tell my people the money is available and we [will] set up a meeting for the next day or so." Butchy asked Mattio to arrange for him to receive

---

1. The discrepancy between the price of $160,000, and the previously discussed price of $165,000 per kilogram, is unexplained in the record, but is in any event not relevant to the issues before us.

a half-kilogram on consignment, and stated that the actual exchange would be handled between Mattio and Ruggiero. A short while later, a DEA Agent saw Ruggiero and appellant Martino walking up and down the street in the vicinity of Wilkinson and Westchester Avenues for a period of ten minutes or so, engaged in conversation and "using hand motions and such."

On August 9, 1983, Butchy telephoned Mattio and arranged for Ruggiero to meet with Mattio at noon on August 10, 1983, at the Bay Terrace Shopping Center in Queens to make the exchange. Also on August 9, appellant Martino contacted one Philip DeSimone, a long-time acquaintance, and sought permission to borrow his 1967 gray Chevrolet purportedly in order to meet his girlfriend. DeSimone agreed, and on the morning of August 10, 1983, appellant Martino, who was accompanied by co-defendant Neal Ruggiero, picked up the car. Martino told DeSimone he would return the car that day.

As planned, Mattio arrived at the Bay Terrace Shopping Center at noon on August 10 and looked for Ruggiero. He found him in front of Bridge's Steak Pub. Ruggiero left to go to the parking lot to get the money, but first he asked Mattio if he had the kilogram separated into half kilos. Mattio stated that they were separated but taped together, to which, according to Mattio, Ruggiero replied, "We'll have to take the tape off, because I have to bring back one package to Butch, and the other guy gets the other half."

DEA Agent Cavuto, who was conducting surveillance of the transaction, testified that on August 10 he was in a car in the parking lot and observed Ruggiero—before he met Mattio—walk up to two cars parked side by side and facing in the same direction; one was a 1967 gray Chevrolet and the other was a 1976 or 1977 gold Chrysler. Ruggiero then met Mattio in front of the restaurant at about 12:15 p.m. and, after spending about five minutes with him inside the restaurant, Ruggiero came out and walked through the parking lot back in the direction of the two cars. DEA Agent Maguire, who was also conducting surveillance in the parking lot at that time, later identified the driver of the gold car as Scarvalone and the driver of the gray car as appellant Martino. Ruggiero, upon returning to the two vehicles, reached into the gold Chrysler and removed a red plastic bag, later found to contain $50,000—he turned toward Martino in the gray Chevrolet, and Maguire testified that he saw each of them moving their hands; then Ruggiero walked back toward Bridge's Steak Pub carrying the red plastic bag and entered Mattio's car.

Ruggiero displayed the cash inside the red bag and asked for the merchandise. Mattio produced two taped half-kilogram packages, cut the tape and handed them to Ruggiero who stuffed one into his waistband and placed the other inside a beige sports bag which Mattio gave to him. While this was occurring, appellant Martino and Scarvalone had turned around in their respective vehicles and for several minutes faced in the direction of Mattio's car; afterward, they turned to each other and gesticulated.

Ruggiero left Mattio's car and walked toward the cars in which Martino and Scarvalone were seated; again he walked between the two cars; the driver's window of Martino's car was open and his engine was running; Ruggiero placed the beige bag in the passenger's side of Scarvalone's car. At that point, the agents seized Ruggiero, Martino and Scarvalone and seized the half-kilogram package from Scarvalone's car—later the other half-kilogram was retrieved from Ruggiero's waistband.

After Martino was informed of his rights, Agent Cavuto asked him what he was doing in the car; he replied that he was waiting for his wife who was shopping at the Grand Union in the shopping center. During his processing, Martino asked Agent Scalzo, "Artie, can you give the car back? It doesn't belong to me. The guy who owns it had nothing to do with what happened today." When Scalzo asked if Martino meant that the owner of the car "did not know anything about the deal to-

day," Martino replied that the owner "had nothing to do with it."

When questioned further about the events at the shopping center, Martino admitted knowing Ruggiero but stated that it was just a coincidence that he happened to meet him at the shopping center. He also changed his earlier statement and said that he was not waiting for his wife but for his girlfriend, Carol DeLuca, from the Bronx.

At the trial, Ms. DeLuca identified Martino as someone she had met about two years ago; she knew him as "Donny" and wasn't sure if she knew his last name; she had seen him twice since meeting him, the last time in July 1983; she had not seen him at any time in August 1983; and although she had been to the Bay Terrace Shopping Center, she had not ever been there with Martino.

Over objection by defense counsel, the trial judge admitted in evidence Martino's 1973 judgment of conviction for federal narcotics offenses, which resulted in his being sentenced as a youthful offender, although the sentencing judge later declined to expunge his conviction. This evidence was received pursuant to Fed.R. Evid. 404(b) as similar act evidence bearing on the issues of Martino's knowledge and intent in this case. Appellant argues that his eleven-year-old conviction for narcotics offenses should not have been admitted in evidence because of its remoteness in time, slight probative value, and resulting prejudice.

Appellant further contends that the government's evidence was insufficient to support a conviction in that evidence showing mere presence at the scene of a crime even when coupled with knowledge that a crime is being committed, or mere association with conspirators, is insufficient to establish membership in a conspiracy. Appellant also asserts that false exculpatory statements are insufficient proof upon which to rely when the evidence of guilt is otherwise weak. Further, he argues that the failure of the trial judge, upon request, to instruct the jury as to the significance

and weight to be accorded false exculpatory statements was reversible error.

## DISCUSSION

### A. Sufficiency of the Evidence

Appellant contends that there was insufficient evidence to support his conviction. The principles governing challenges to the sufficiency of the evidence are well-settled: the defendant making the insufficiency claim bears a "very heavy burden," *United States v. Soto,* 716 F.2d 989, 991 (2d Cir. 1983); "[t]he verdict of a jury must be sustained if there is substantial evidence ... to support it"; *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), and we must view the evidence in the light most favorable to the government, *id.* The jury must have a full opportunity to determine credibility, weigh the evidence, and draw justifiable inferences of fact, *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir.1972); and all permissible inferences must be construed in favor of the government. *United States v. Young,* 745 F.2d 733, 762 (2d Cir.1984); *United States v. Bagaric,* 706 F.2d 42, 64 (2d Cir.), *cert. denied,* — U.S. ——, 104 S.Ct. 133, 283, 78 L.Ed.2d 128 (1983); *United States v. Dazzo,* 672 F.2d 284, 288 (2d Cir.), *cert. denied,* 459 U.S. 836, 103 S.Ct. 81, 74 L.Ed.2d 77 (1982).

It is also settled that the existence of a conspiracy, and a defendant's membership in it, may be proved entirely by circumstantial evidence, *United States v. Soto,* 716 F.2d at 991. Yet, as appellant asserts, this Court has held that absent evidence of purposeful behavior, mere presence at the scene of a crime, even when coupled with knowledge that a crime is being committed, is insufficient to establish membership in a conspiracy; and mere association with conspirators is similarly insufficient. *United States v. Pedroza,* 750 F.2d 187, 198 (2d Cir.1984); *United States v. Johnson,* 513 F.2d 819, 823–24 (2d Cir. 1975). There must be some evidence that the defendant has "associat[ed] himself with the venture in some fashion, 'participat[ed] in it as something that he wish[ed]

to bring about,' or '[sought] by his action to make it succeed.' " *United States v. Johnson*, 513 F.2d at 823 (quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938)).

■ Assessed singly, or even in combination with several others, the events herein involving Martino could be perceived as "mere presence" or "mere association" on his part. We must, however, view the events as a whole. "Pieces of evidence must be viewed not in isolation but in conjunction." *United States v. Young*, 745 F.2d 733, 762 (2d Cir.1984) (quoting *United States v. Carson*, 702 F.2d 351, 362 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983)). Viewing the events in this manner, we are presented with a different picture. Among the principal events in evidence relating to appellant are:

1. On July 31, 1983, Butchy stated to Mattio that, as a last resort he could sell "the drugs to some guys on Buhre Avenue." Martino previously had owned and worked in a beauty salon on Buhre Avenue and in 1983 he was frequently seen "hanging out" there and nearby.

2. On August 8, 1984, in response to Mattio's insistence that they be "absolutely sure there was money available" to close the drug deal, Ruggiero left and "was supposed to come with ... the person who had the money." Shortly afterward, while Butchy and Mattio talked, Ruggiero rode by in a car, and Butchy observed "There they go now." It was too dark to see who was in the car with Ruggiero. Minutes later, Ruggiero was observed walking in the vicinity with Martino for about ten minutes apparently engaged in conversation.

3. Ruggiero, a participant in the planned heroin transaction, joined Martino on the morning of August 10, 1983 (the date of the transaction), and to-

gether they went to DeSimone's house in the Bronx where Martino borrowed DeSimone's 1967 gray Chevrolet.

4. That same day, at noon, Martino arrived at the time and place pre-arranged for the drug transaction—the Bay Terrace Shopping Center in Queens.

5. Martino remained parked adjacent to drug-buyer Scarvalone while each facet of the transaction occurred—Scarvalone and Martino were observed looking to the rear of their respective vehicles, apparently watching Ruggiero's movements as the exchange of money and "drugs"[2] took place.

6. When arrested, Martino was seated in the Chevrolet with the engine running; he falsely stated he was at the parking lot waiting for his wife while she shopped at the Grand Union.

7. Martino later changed his statement and said that he was there with his girlfriend, Carol DeLuca, from the Bronx. Ms. DeLuca testified that she knew Martino but had never been at that shopping center with him.

At a trial, it is the function of a jury to determine the facts from the evidence presented, and it is also their function to draw reasonable inferences from the facts which they find. From the evidence presented herein, we conclude that the jury could determine that a conspiracy to traffic in narcotics existed as charged and that the appellant was no mere bystander but was a member of that conspiracy. *See United States v. Diez*, 736 F.2d 840, 843 (2d Cir. 1984).

■ It is elementary that each member of a conspiracy need not know all of the details concerning the unlawful agreement, *United States v. Gleason*, 616 F.2d 2, 16 (2d Cir.1979), *cert. denied*, 444 U.S. 1082, 100 S.Ct. 1037, 62 L.Ed.2d 767, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980); *United States v. Bobo*, 586 F.2d 355, 370 n.

---

**2.** The packages had been supplied by the DEA and did not contain heroin, but rather a white powder resembling heroin.

20 (5th Cir.1978), *cert. denied*, 440 U.S. 976, 99 S.Ct. 1546, 59 L.Ed.2d 795 (1979); *United States v. Anthony*, 565 F.2d 533, 539 (8th Cir.1977), *cert. denied*, 434 U.S. 1079, 98 S.Ct. 1274, 55 L.Ed.2d 787 (1978), nor need the conspiracy come to a successful conclusion. *See Iannelli v. United States*, 420 U.S. 770, 777–79, 95 S.Ct. 1284, 1289–90, 43 L.Ed.2d 616 (1975); *United States v. Villarreal*, 546 F.2d 1145, 1146 (5th Cir.), *cert. denied*, 431 U.S. 917, 97 S.Ct. 2181, 53 L.Ed.2d 228 (1977); *United States v. Agueci*, 310 F.2d 817, 828 (2d Cir.1962), *cert. denied*, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963); *United States v. McKnight*, 439 F.Supp. 536, 539 (E.D.Pa.1977). It is the unlawful agreement itself which constitutes the crime. *Iannelli v. United States*, 420 U.S. at 777, 95 S.Ct. at 1289; *United States v. Marable*, 578 F.2d 151, 153 (5th Cir.1978) (quoting *Braverman v. United States*, 317 U.S. 49, 53, 63 S.Ct. 99, 101, 87 L.Ed. 23 (1942)); *United States v. Nuccio*, 373 F.2d 168, 174 & n. 4 (2d Cir.), *cert. denied*, 387 U.S. 906, 87 S.Ct. 1688, 18 L.Ed.2d 623 (1967); *United States v. Agueci*, 310 F.2d at 828; *United States v. McKnight*, 439 F.Supp. at 539. As previously stated, the crime of conspiracy can be proved entirely through circumstantial evidence. *United States v. Soto*, 716 F.2d at 991; *United States v. Turcotte*, 515 F.2d 145, 150 (2d Cir.), *cert. denied*, 423 U.S. 1032, 96 S.Ct. 564, 46 L.Ed.2d 406 (1975).

Defense counsel argued to the jury in summation that appellant was only coincidentally present on the several occasions described above and that the evidence did not prove beyond a reasonable doubt that Martino had joined in the unlawful agreement charged in the indictment. The government argued to the contrary. It is apparent that the jury accepted the government's interpretation of the significance of the evidence. We hold there was sufficient evidence to warrant the jury's conclusion of Martino's guilt. Based upon the entire series of activities which occurred herein, including some events seemingly innocent if not viewed in context, the jury had sufficient evidence upon which to accept the government's theory and to conclude that, since Scarvalone was only purchasing one-half of the available "heroin," the other half was destined for another customer and that Martino was that customer. The jury was entitled to conclude that Martino participated in a scheme to purchase and subsequently sell one kilogram of heroin, divided into two one-half kilo packages—one of which was actually delivered to Scarvalone. The fact that the aim of the conspiracy charged was not achieved fully is not at all fatal to the conclusion that a conspiracy existed and that Martino was a member in it.

## B. *Admission of the Prior Drug Conviction*

Martino did not deny his presence in the Bay Terrace Shopping Center but he did deny that he had knowledge or intent regarding the drug transaction. He squarely placed in issue whether he possessed the requisite knowledge or intent to demonstrate his participation in the conspiracy charged. See *United States v. Williams*, 577 F.2d 188, 192 (2d Cir.), *cert. denied*, 439 U.S. 868, 99 S.Ct. 196, 58 L.Ed.2d 179 (1978). Over objection by defendant's counsel, the government offered, pursuant to Fed.R.Evid. 404(b), and the court admitted, evidence of an eleven-year-old prior conviction of Martino for federal narcotics offenses; when sentenced thereon Martino was adjudicated a youthful offender—although, as noted, the sentencing judge subsequently declined to expunge the conviction.

Judge Lasker carefully assessed the probative value of this prior conviction evidence against its danger of unfair prejudice and concluded that its probative value was not outweighed by its potential for unfair prejudice. He thereupon received the evidence but in doing so he specifically charged the jury as to the limited use they could make of this evidence. Later, during his instruction to the jury he reiterated the specific *limited* purpose and use of this evidence. Joint Appendix at 263 (emphasis in original).

■ Martino, by his defense, placed in issue the question of knowledge and intent as to his association with alleged co-conspirators on at least three separate occasions, including his presence at the shopping center, and argued in summation that it amounted to "mere association" and that his presence was "mere presence" and nothing more. Thus, the government in an effort to meet its burden of proof was certainly entitled to offer this prior similar act evidence to aid the jury in assessing Martino's intentions during his presence on at least three separate occasions during ongoing drug transactions. *See United States v. Barton,* 647 F.2d 224, 239 n. 12 (2d Cir.), *cert. denied,* 454 U.S. 857, 102 S.Ct. 307, 70 L.Ed.2d 152 (1981); *United States v. Deaton,* 381 F.2d 114, 117 (2d Cir.1967).

■ It is clear that the trial judge carefully weighed the competing factors of probative value versus unfair prejudice before ruling that the probative value of the evidence was not substantially outweighed by the prejudice to the defendant and that the eleven-year-old judgment of conviction would be received in evidence; we note that he did exclude the indictment on which it was based. A trial court's ruling, following a "conscientious assessment" of the Rule 403 factors, will not be overturned on appeal absent a clear showing of abuse of discretion. *United States v. Jamil,* 707 F.2d 638, 642 (2d Cir.1983); *Ballou v. Henri Studios, Inc.,* 656 F.2d 1147, 1153 (5th Cir.1981); *United States v. Williams,* 596 F.2d 44, 51 (2d Cir.), *cert. denied,* 442 U.S. 946, 99 S.Ct. 2893, 61 L.Ed.2d 317 (1979); *United States v. Albergo,* 539 F.2d 860, 863 (2d Cir.), *cert. denied,* 429 U.S. 1000, 97 S.Ct. 529, 50 L.Ed.2d 611 (1976).

Since a showing of knowledge and intent were essential in order for the government to meet its burden of proof in this case, and since the prior conviction of federal narcotics offenses was evidence which could be interpreted by the fact-finders as shedding light on these key issues, the evidence was both relevant and probative and the trial judge did not abuse his discretion by his ruling, despite the vintage of the conviction. *See United States v. Terry,* 702 F.2d 299, 316 (2d Cir.) (20-year-old drug conviction would have been admissible as bearing on knowledge and intent), *cert. denied,* 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983); *United States v. Alessi,* 638 F.2d 466, 476 (2d Cir.1980) (1972 conviction for similar offense admitted as bearing on intent).

## C. Failure to Charge Jury Regarding False Exculpatory Statement

At the close of the testimony, and almost as an afterthought, defense counsel sought to have an instruction given to the jury regarding false exculpatory statements. This came as a counter-move to a supplemental request by the government. Following a lengthy colloquy with counsel for each party as to whether to include language from *United States v. Johnson,* 513 F.2d 819, 824 (2d Cir.1975), and having weighed their respective arguments, the trial judge denied both the government's and defendant's requests and gave no instruction to the jury regarding the matter.

■ Relying upon *Johnson,* Martino argues that this was error requiring reversal, especially since, according to him, the evidence against him was "weak." While the evidence against Martino herein was less than overwhelming, we do not believe it was insufficient. It is true that a false exculpatory statement may fail to save an otherwise inadequate case. *Id.; United States v. Kearse,* 444 F.2d 62 (2d Cir.1971); *United States v. McConney,* 329 F.2d 467 (2d Cir.1964); *accord, United States v. Gaviria,* 740 F.2d 174 (2d Cir.1984). However, given our finding as to the sufficiency of the evidence herein, we hold that it was within the discretion of the trial court to determine whether or not to give the requested instruction as it related to consciousness of guilt. *United States v. Indorato,* 628 F.2d 711, 720 (1st Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 578, 66 L.Ed.2d 476 (1980). "We have sanctioned the giving of this charge in criminal cases ... on the issue of guilt. [citation omitted]

However, we have never held it error not to give the charge." *Fernandez v. Fitzgerald*, 711 F.2d 485, 487 n. 1 (2d Cir.1983); *see also United States v. Robinson*, 475 F.2d 376, 384 (D.C.Cir.1973); Federal Judicial Center Committee to Study Criminal Jury Instructions, *Pattern Criminal Jury Instructions* 51–53 (1982). As the court found in *Indorato:* "The charge here was thorough, accurate and clear. The jury was instructed on the elements of the crim[e], the presumption of innocence, proof beyond a reasonable doubt, the weighing of evidence, ... the difference between circumstantial and direct evidence, and the drawing of reasonable inferences." 628 F.2d at 720.

Under the circumstances as they exist herein, we hold that it was not an abuse of discretion for the trial judge to decline to further amplify upon his clear instruction to the jury.[3]

We affirm.

---

**3.** The Seventh Circuit has taken a similar position with respect to such charges. *See* Judicial Conference of the Seventh Circuit, *Model Jury Instructions* § 3.13 (1983).