**UNITED STATES of America**

v.

**Emiro CUERVELO, Omaira Gomez–Galvis, Jose Fernando Cardona, Sigfredo Mejia Sanchez, Antonio Jaramillo, Cesar Bravo, Luis Alberto Correa, and Carlos Alberto Gomez–Galvis, Defendants.**

**No. S 89 Cr. 305 (PKL).**

United States District Court, S.D. New York.

Dec. 12, 1989.

Otto G. Obermaier, U.S. Atty., S.D.N.Y. (Christine Gray, of counsel), New York City, for U.S.

Robert N. Scola, Jr., Coral Gables, Fla., for defendant Cesar Bravo.

Quinon & Strafer (Jose Quinon, of counsel), Coral Gables, Fla., for defendant Luis Alberto Correa.

LEISURE, District Judge.

All defendants were charged in count one of a three-count indictment with con-

spiracy to distribute and to possess with intent to distribute over 200 kilograms of a substance containing the narcotic drug cocaine ("cocaine"). Additionally, defendants Omaira Gomez–Galvis and Jose Fernando Cardona ("Cardona") were charged in count two with conspiracy to import 390 kilograms of cocaine and, in count three, with a substantive count of importation of 390 kilograms of cocaine.[1] A trial was held beginning September 11, 1989. On October 23, 1989, the jury returned a verdict finding all defendants, except Carlos Alberto Gomez–Galvis, guilty of conspiracy to distribute cocaine (count one), and finding Omaira Gomez–Galvis guilty on all three counts, while acquitting Cardona on counts two and three.

After the close of all the evidence, each defendant made motions for acquittal pursuant to Fed.R.Crim.P. 29(b). The Court reserved decision on the Rule 29 motions pursuant to Rule 29(b). After the jury returned its verdict, the Court denied all the Rule 29 motions except those as to defendants Cesar Bravo ("Bravo") and Luis Alberto Correa ("Correa"), on which the Court continued to reserved decision pending the submission of papers on those motions. The motions on behalf of Bravo and Correa urge a judgment of acquittal based on the insufficiency of the evidence submitted at trial. Papers have now been submitted by the government and by both defendants. The Court has reviewed those papers and the evidence at trial relating to Bravo and Correa. Based on that review, the Court denies the motions of defendants Bravo and Correa for acquittal pursuant to Rule 29(b).

## DISCUSSION

"[A] party challenging the sufficiency of evidence bears a very heavy burden." *United States v. Campino*, 890 F.2d 588, 594 (2d Cir.1989); *United States v. Adegbite*, 877 F.2d 174, 179–80 (2d Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 370, 107 L.Ed.2d 356 (1989). "A conviction must be allowed to stand if, 'after viewing the evidence in the light most favorable to the

prosecution,' the reviewing court finds that '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Casamento*, 887 F.2d 1141, 1156 (2d Cir. 1989), *quoting, Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). In making its determination about the sufficiency of evidence at trial, the Court must view the various pieces of evidence in concert as a whole, and not individually. *United States v. Young*, 745 F.2d 733, 762 (2d Cir.1984), *cert. denied*, 470 U.S. 1084, 105 S.Ct. 1842, 85 L.Ed.2d 142 (1985). The Second Circuit has noted that viewing the evidence as a whole is particularly important in a conspiracy case such as the one now before the Court, because so much of the evidence, while not incriminating on its face and when viewed in isolation, may be used by the jury to draw a reasonable inference about the alleged conspiracy. *Id.*

Bravo and Correa assert that the government did not present sufficient evidence to allow any rational juror to find that either defendant had a connection to the conspiracy to distribute cocaine charged in the indictment. The Court is not without guidance on this issue. Unwilling, but out of necessity, the federal courts in recent years have become quite familiar with the ways of conspiracies to distribute and/or import narcotic drugs. Accordingly, there is substantial case law on this issue spanning a wide range of factual situations.

The Second Circuit has shown substantial deference to juries in reviewing conspiracy convictions, in large part because the proof of conspiracy is often so dependent on circumstantial evidence and inferences. As one commentator, cited with approval by the Second Circuit, has stated,

Conspiracy is by nature a clandestine offense. It is improbable that the parties will enter into their illegal agreement openly; it is not necessary, in fact, that all the parties ever have direct contact with one another, or know one an-

---

1. Emiro Cuervelo was also named as a defendant in all three counts in the indictment. He

was at the time of trial, and remains at the time of this Opinion, a fugitive.

other's identity, or even communicate verbally their intention to agree. It is therefore unlikely that the prosecution will be able to prove the formation of the agreement by direct evidence, and the jury must infer its existence from the clear co-operation among the parties. *Developments in the Law—Criminal Conspiracy*, 72 Harv.L.Rev. 920, 933 (1959), *cited in United States v. Nusraty*, 867 F.2d 759, 762 (2d Cir.1989); *United States v. Young*, 745 F.2d 733, 762 (2d Cir.1984). Once the existence of a conspiracy is shown, "evidence sufficient to link another defendant to it need not be overwhelming." *Nusraty*, 867 F.2d at 762 (citations omitted).

 The government does have the burden of making the connection between the defendant and the conspiracy. "The agreement between the party charged and his coconspirators is the gist of the crime of conspiracy." *Id.* at 763. The proof of such an agreement is crucial to the government's case for the finding of guilt in a conspiracy case. Such proof is not always a simple matter. It is elemental that "mere presence [at the scene of a criminal act], even coupled with the knowledge that a crime was being committed there, is not enough to establish [ ] guilt" *United States v. Soto*, 716 F.2d 989, 991 (2d Cir.1983). Similarly, "mere association with conspirators does not establish participation in a conspiracy." *United States v. Rios*, 856 F.2d 493, 496 (2d Cir.1988); *United States v. Diez*, 736 F.2d 840, 843 (2d Cir.1984). "[T]here must be some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir.1984).

 These requirements of proof cannot be read too broadly, however. "The size of a defendant's role does not determine whether that person may be convicted of conspiracy charges. Rather, what is important is whether the defendant wilfully participated in the activities of the conspiracy with knowledge of its illegal ends."

*United States v. Vanwort*, 887 F.2d 375, 386 (2d Cir.1989). Participation in a single act in furtherance of the conspiracy is enough to sustain a finding of knowing participation. *Id.; United States v. Zabare*, 871 F.2d 282, 287 (2d Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989). Further, it is not essential that each member of a conspiracy know all the details of the agreement or of the events planned. Nor is it necessary that the conspiracy be successfully concluded. It is the agreement, and the defendant's participation in it, which constitutes the crime. *United States v. Martino*, 759 F.2d 998, 1003–4 (2d Cir.1985).

This case began in 1988 when Omaira Gomez–Galvis ("Omaira"), Emiro Cuervelo, and an undercover agent of the Drug Enforcement Administration ("DEA") met in Panama to plan drug shipments to the United States. After extensive negotiations and a series of false starts, an agreement was reached in early 1989 for a shipment of some 390 kilograms of cocaine to be shipped to New York. The DEA, through the auspices of its undercover agent and his contacts in New York, arranged for a plane and a pilot to fly the shipment of drugs to White Plains, New York. From there, 231 kilograms of the cocaine was to be distributed for sale in the New York area. The remainder of the shipment was to be paid to the undercover agents as a fee for the transportation services provided.

The cocaine arrived in New York on April 6, 1989. An agreement was reached between the undercover agents, Omaira and the distributors whom she had contacted in New York, that the cocaine would be turned over to the distributors at a meeting to be held on the evening of April 7, 1989 in the TriBeCa section of Manhattan. Omaira's contact with the distributors was Cardona. Additionally, Omaira was staying at Cardona's apartment in Brooklyn while she arranged the sale of the cocaine to the distributors.

A DEA undercover agent met Cardona in TriBeCa after 7:00pm on April 7, 1989. At that time the agent was introduced to two

of the distributors, Antonio Jaramillo ("Jaramillo") and Sigfredo Mejia Sanchez ("Sanchez"), who had come to pick up the cocaine. The undercover agent gave Jaramillo possession of the van which allegedly contained the cocaine, and Sanchez took Jaramillo's car. Both Jaramillo and Sanchez drove, by separate routes, to a house located at 57–20 226th Street in Queens, New York. DEA agents followed both the van and Sanchez's car and arrived at that address just as the van was pulling into the driveway at the house. At the house, Jaramillo exited the van and went inside. He emerged from the garage a few minutes later with Bravo. Correa was seen at the front door, looking to his right and to his left. Jaramillo then got back into the van and drove it into the garage while Bravo remained outside, looking out at the street. Immediately after the van entered the garage, agents exited their vehicles and placed Jaramillo, Sanchez, Bravo and Correa under arrest.

At the time of the arrest, agents searched the house, finding it to be only sparsely furnished.[2] At the same time, agents seized communications beepers from defendants Jaramillo, Bravo and Correa.[3] Additionally, agents seized from Bravo a New Jersey driver's license containing an address, which agents later determined was false. Agents also later determined that the house at 57–20 226th Street was rented by Sanchez on December 31, 1988, who used the name "Miguel Montes" on the rental forms. Additionally, Sanchez paid close to $4000 in cash up front to the landlord at the time of the rental.

Bravo and Correa allege that, as a matter of law, the evidence before the jury was insufficient to convict either of them of count one of the indictment, conspiracy to distribute, or to possess with intent to distribute, cocaine. While there is substantial overlap in the evidence submitted against both Bravo and Correa, there are differences, and thus the Court chooses to address the sufficiency of the evidence against each one separately, beginning with Correa.

### A) Luis Alberto Correa

█ Correa was present at the house at 57–20 226th Street with his cousin Bravo and Bravo's wife and child at the time the van allegedly containing the cocaine arrived at the house. When the van arrived, Correa went to the front door of the house, and looked out to the right and to the left as the van was being driven into the garage. At least one government agent testified that Correa's actions at the front door were typical of those of a "lookout" for a drug transfer. When arrested, Correa was found to have in his possession a communications beeper. The service contract for that beeper was renewed at the same time as that for Jaramillo's beeper and at the same time that Bravo's beeper was purchased. After the arrest, Correa's beeper received a message to call the number of the apartment in Brooklyn where Omaira was staying with Cardona. In addition, Correa's beeper number was found on the back of an envelope containing a group of numbers connected with the conspiracy which was in Omaira's possession when she was arrested. Further, the telephone number which appeared on Correa's beeper was followed by the code number "21," which

---

**2.** It is undisputed that the following items were in the house: in the livingroom, a TV, a nightstand, a sectional sofa, and a lamp; in the kitchen, some cooking utensils and some pots and pans; in one bedroom, a mattress on the floor; in another bedroom, in which Bravo's wife and small child were found, a mattress on a frame and a nightstand. A third bedroom was apparently empty. There is conflicting testimony between the agents who searched the house as to whether there were any toys found in the livingroom or elsewhere.

**3.** The three beepers seized all came from the same company, the American Beeper Company. The service contracts for Jaramillo and Correa's beepers were renewed on the same day, March 16, 1989, and by the same person who also purchased Bravo's beeper. After the arrests, the beepers were left in receiving mode for several days. During that time, Jaramillo's beeper received incoming messages from the same numbers as messages received by Correa's beeper. At least one of the numbers received by Correa's beeper was the number of Cardona's apartment where Omaira was staying.

Omaira used to keep in touch with the distributors.

Taking all the evidence together and viewing in a light most favorable to the government, as the Court must in determining the sufficiency of the evidence, the Court finds that a reasonable jury could find Correa guilty of conspiracy to distribute. "Assessed singly, or even in combination with several others, the events herein involving [the defendant] could be perceived as 'mere presence' or 'mere association' on his part. We must, however, view the events as a whole." *United States v. Martino*, 759 F.2d at 1003. "Viewing the evidence in conjunction is especially important in a conspiracy case such as this, where so much of the evidence is not incriminating on its face and the jury, to infer the existence of a conspiracy, must piece together circumstantial evidence." *United States v. Casamento*, 887 F.2d at 1156.

Correa, in support of his motion for a judgment of acquittal, asserts that the evidence against him amounts to no more than a series of coincidences and acts of suspicious, but otherwise innocent, behavior. The Court, however, finds that a reasonable jury could have concluded that Correa's actions, when taken together, showed his knowledge of, and participation in, the conspiracy to distribute the cocaine imported by Omaira. There was a conspiracy in existence on April 7, 1989, to distribute the 231 kilograms of cocaine delivered to Sanchez and Jaramillo in TriBeCa.[4] The jury could have reasonably inferred participation in the conspiracy from the combination of the following facts: 1) Correa's possession of a beeper, 2) the presence of Correa's beeper number on Omaira's list of

telephone numbers, 3) Correa's presence at the time and place of the delivery of the cocaine, 4) Correa's actions at the time of the delivery which could be construed to be those of a lookout, 5) the fact that Correa's beeper was renewed at the same time as that of convicted conspirator Jaramillo, and 6) the fact that Correa belonged to the same health club as other defendants.

Both the use and possession of a beeper, *United States v. Zapata–Tamallo*, 833 F.2d 25, 28 (2d Cir.1987), and acting in a manner that could indicate the performance of lookout duties, *United States v. Torres*, 845 F.2d 1165, 1168 (2d Cir.1988), have been considered as evidence going toward a finding by a jury of guilt of conspiracy. The Court thus finds that given all the evidence, particularly the link between Correa and Omaira created by the presence of Correa's phone number on Omaira's list and by the message on Correa's beeper to call the apartment where Omaira and Cardona were staying, received after his arrest but before Omaira's arrest, a reasonable jury could find Correa guilty of the conspiracy charged. Accordingly, defendant Correa's motion must be denied.

### B.) Cesar Bravo

The case against Bravo is not as extensive as that against Correa. The direct evidence against Bravo centers on his presence in the house to which the cocaine was delivered, and on his possession of a beeper which was purchased at the same time that the contracts for Jaramillo's and Correa's beepers were renewed. There is additional circumstantial evidence, however, which was before the jury. The house in which Bravo, his wife, and small child were found,[5] and to which the cocaine

---

**4.** This fact alone distinguishes this case from *United States v. Nusraty*, 867 F.2d 759 (2d Cir. 1989), relied on in part by defendants. In *Nusraty*, the Court found that there was no conspiracy to which to link the defendant since defendant's alleged co-conspirator had been previously acquitted. 867 F.2d at 762. Here, since the existence of a conspiracy was conclusively shown by the government, the evidence required to link a defendant to that conspiracy "need not be overwhelming." *Id.*

**5.** The government asserts that there was substantial evidence at trial the no one lived at the house at 57–20 226th Street. The Court does not accept this interpretation of the evidence. While there is substantial evidence that the apartment was sparsely furnished and that few clothes were found in the apartment, there is also substantial evidence, in the form of testimony from Bravo's wife, Luz Marina Henao–Sanchez, and from Marjorie Velez, a friend of the Bravos, that the Bravos resided at 57–20 226th Street. Additionally, there are photo-

was delivered, was rented by Sanchez, a convicted member of the conspiracy. In so renting the apartment, Sanchez used a false name and paid a substantial upfront payment in cash. Additionally, Bravo, along with Sanchez and other defendants were members of the same health club in Queens. And on the night of the delivery of the cocaine, Bravo assisted Jaramillo in opening the garage door and acted in a manner which could be construed to be acting as a lookout. Finally, at the time of his arrest, Bravo was in possession of a New Jersey driver's license in his name which listed a non-existent address. When asked by agents for his address, Bravo gave both the Queens address where he was arrested and, later, the false address in New Jersey. Bravo was at the time of his arrest, and, apparently, was at all time since his arrival in the United States on November 21, 1988, unemployed.

As with much of the evidence against Correa, each item of evidence stated above, viewed individually, could been seen as wholly innocent or as no more than evidence of mere presence or mere association. However, taken together, the Court finds that a reasonable jury, drawing all reasonable inferences, could find that Bravo had knowledge of, and participated in, the conspiracy. Unlike Correa, there is no evidence linking Bravo to Omaira, Cardona, or any of the DEA agents involved in the importation. However, the government is not required to prove that the defendant conspired directly with every other member of it, or even knew every member. *United States v. Rooney*, 866 F.2d 28, 32 (2d Cir. 1989); *United States v. Friedman*, 854 F.2d 535, 562 (2d Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1637, 104 L.Ed.2d 153 (1989); *United States v. Alessi*, 638 F.2d 466, 473 (2d Cir.1980).

There is substantial evidence of Bravo's connection to Sanchez, Jaramillo, and Correa. While much of that evidence goes only to Bravo's association with the conspirators, three pieces of evidence, in combination with the evidence of association, could be used by a rational juror to find knowledge of and participation in the conspiracy. First, and most important, is Bravo's possession of a beeper purchased at the same time—and by the same person—as the renewal contracts for Sanchez's and Correa's beepers. As noted previously, courts have found possession of beepers to be evidence of participation in a drug conspiracy. *United States v. Torres*, *supra.* Second, Bravo and his family were found in a house rented by Sanchez under a false name. Given the government's extensive evidence that this house was being used as a "stash pad," [6] and thus was part and parcel of the conspiracy, it would be reasonable for the jury to infer knowledge on Bravo's part of the use of that house. Finally, at the time of the delivery of the cocaine to the house, Bravo acted in a manner which could be inferred to be that of a lookout. Additionally, Bravo and Correa waited in the sheet-shrouded living-room from approximately 7:00 pm until the van arrived at almost 10:00 pm, and then met in the same room with Jaramillo and Correa in that same room for a few minutes prior to helping Jaramillo open the garage door. From that conduct, a reasonable jury could infer participation in the conspiracy.

Based on this evidence, the Court finds that a reasonable jury could have found Bravo guilty of the conspiracy charged in the indictment. Accordingly, defendant Bravo's motion for a judgment of acquittal is denied.

graphs in evidence which indicate that the Bravos resided at 57–20 226th Street for at least some period of time. Thus, the Court finds that a reasonable inference could be drawn that the Bravos were in residence at 57–20 226th Street.

**6.** The fact that the Bravos may have resided at 57–20 226th Street does not obviate the government's substantial evidence that the main pur-

pose of the house was to store drugs. The Court point, in particular, to the fact that the windows in the livingroom and elsewhere in the house were completely covered with sheets, which were apparently nailed to the windows. Accordingly, the Court finds that a reasonable jury could have found that 57–20 226th Street was rented for the purpose of being a "stash pad."

## CONCLUSION

Based on the foregoing discussion, the motions of Cesar Bravo and Luis Alberto Correa for judgments of acquittal pursuant to Fed.R.Crim.P. 29 are DENIED.

SO ORDERED.