Christopher OLSON, Alfred Setsky, Steven M. Cecchini, Ronald Della Bernarda, Betty J. Finan, John R. Finan, Wayne K. Finan, Michael E. Kennedy, Anthony Mozzicato, III, Kevin Charbonneau, Christine Clifford, Raymond G. Smith, Robert J. Iacino, and Joseph Sandamena

v.

Roy BRADRICK, and Francis Felber.

Civ. No. H–84–1082(AHN).

United States District Court, D. Connecticut.

Sept. 30, 1986.

Jeffrey Drewniany, Williams & Wise, New Haven, Conn., for plaintiffs.

Francis H. Morrison, III, James F. Rotundo, Day, Berry & Howard, Hartford, Conn., for defendants.

## RULING ON PLAINTIFFS' MOTION FOR A NEW TRIAL

NEVAS, District Judge.

In January of 1984, officers of the South Windsor Police Department sought and received a warrant authorizing a search and seizure of items relating to unlawful gambling at the B & G Lounge. The B & G Lounge, a cafe in South Windsor, Connecticut, had been hosting a card tournament involving the low-stakes wagering of money. Supported by evidence seized in the course of executing the warrant, arrest warrants were then obtained. South Windsor police officers arrested a number of people associated with the B & G Lounge card tournament on charges of gambling. The gambling charges were subsequently dismissed by a Connecticut state court judge.

Fourteen of those people arrested and charged with various gambling offenses initiated this action, pursuant to 42 U.S.C. Section 1983, against South Windsor police officers Roy Bradrick and Francis Felber in their individual capacities. Plaintiffs allege that defendants, based on the fruits of their fraudulently procured warrant which permitted a search and seizure at the B & G Lounge, maliciously prosecuted them on charges of gambling in violation of their rights secured by the Fourteenth Amendment to the Constitution of the United States and rights secured by state law. Two plaintiffs, the owners of the B & G Lounge, also allege a violation of their fourth amendment rights to be secure from unreasonable searches and seizures arising out of defendants' search of their business premises. *See* Amended Complaint dated January 6, 1986 (filing no. 113). Jurisdiction for the federal claims is predicated on 42 U.S.C. Sections 1983 and 1988, and 28 U.S.C. Sections 1331 and 1343(a)(3). The state-law claims are predicated on pendent jurisdiction. *See United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130,

1139, 16 L.Ed.2d 218 (1966); *Gonzalez v. Doe*, 476 F.2d 680, 686 (2d Cir.1973).[1]

After a six-day jury trial, the jury returned its verdict in favor of the defendants, finding that the two police officers neither maliciously prosecuted plaintiffs in violation of their federal and state-law rights nor violated the two plaintiffs' fourth amendment rights. Based on the jury's verdict, judgment for defendants was entered on January 10, 1986. Seeking to be relieved from the adverse jury verdict and judgment, plaintiffs now move the court to exercise its discretion in ordering a new trial under Rule 59(a)(1), Fed.R.Civ.P., claiming that they were denied a fair trial. Plaintiffs advance these two grounds of juror misconduct in support of their motion for a new trial: (1) a juror's contact with a third-party, who was not involved with this trial, while the jury had recessed its deliberations for the evening, and (2) the same juror's non-disclosure during jury selection *voir dire* that he had relatives who were police officers.[2]

The motion has been briefed and argued. For the reasons more fully stated below, a new trial is not necessary and, therefore, plaintiffs' motion for a new trial is denied.

## FACTS

A recitation of the facts surrounding the selection of the jury and the jury's delibera-tions will furnish a necessary background for assessing plaintiffs' new trial motion.

On December 4, 1985, two civil juries were selected in civil rights cases involving alleged unconstitutional conduct by police officers. Although counsel in this case were to select the second jury, they were present at the *voir dire* of the jury panel. (December 4, 1985, Transcript ("Dec.Tr.") at 2–3, 58 (filing no. 128)). The defendants in the first case were East Hartford police officers. (Dec.Tr. at 9).

After taking an oath (Dec.Tr. at 8),[3] the prospective jurors were questioned on their ability to fairly and impartially decide the cases for which they might be selected as jurors. One question, which is critical to plaintiffs' second ground for a new trial, was "[h]as anyone here or anyone close to you, any member of your family, ever been employed as a police officer or by any law enforcement agency?" (Dec.Tr. at 28). Only three members of the jury panel responded. Each answered that a member of their immediate family is or was a law enforcement officer. (Dec.Tr. at 28–30). One of the three panel members ("Member 28") responded that her deceased grandfather had been a police officer. (Dec.Tr. at 29). A second member ("Member 42") indicated that his brother had been a police

---

1. In an earlier ruling, the court dismissed plaintiffs' federal equal protection claim for failure to allege that defendants acted for any reason impermissible under the equal protection clause and plaintiffs' federal and state claims for false arrest because the law of false arrest provides no remedy where, as here, an arrest is made pursuant to a warrant. *Olson v. Bradrick*, No. H–84–1082, slip op. at 1–2 (D.Conn. May 8, 1985) (Blumenfeld, J.) (filing no. 31). Plaintiffs were entitled, however, to pursue their federal and state claims for malicious prosecution. *Id.* The court declined the invitation to dismiss the pendent state-law claims for malicious prosecution, holding that to dismiss those claims where "[t]here is absolutely no difference in the proof necessary for plaintiffs to make out federal and state malicious prosecution claims" would "only encourage wasteful and duplicative litigation." *Id.* at 2.

2. Plaintiffs' original motion for a new trial, filed on January 24, 1986, was based on juror mis-conduct during jury deliberations. (Filing no. 118). On February 28, 1986, plaintiffs moved to amend their new trial motion, seeking to include a second ground of juror misconduct during jury selection. (Filing no. 124). Defendants objected to the proffered amendment arguing that it was untimely filed. (Filing no. 126). The court granted plaintiffs' motion to amend, ruling that although the motion may be untimely the more prudent course was to hear plaintiffs on all aspects of their unfair trial claim. (Filing no. 127).

3. The following oath is given to civil jurors.

Do you as petit jurors duly summoned to determine issues of fact in cases submitted to this court for trial, solemnly swear to answer truly any questions which the court shall propound as to your qualifications to sit as jurors in any such cases, now or hereafter presented for trial? So help you God.

officer in Wisconsin. (Dec.Tr. at 28). Members 28 and 42 indicated that even though a member of their family had been a police officer, they could decide the case fairly and impartially based on the facts as they found them and on the law as instructed. (Dec.Tr. at 28–29). The third panel member ("Member 34"), who had been a military policeman in the 1940's, stated that his son was a Virginia State Trooper. (Dec.Tr. at 29–30). This prospective juror answered that his ties to law enforcement would create a "problem" in his deciding the case and could influence his decision. (Dec.Tr. at 33, 69). At one point during jury selection in the first case, which involved East Hartford police officers, Member 28 indicated that she knew a couple of East Hartford police officers. (Dec.Tr. at 33).[4]

Counsel in the first case then approached the bench to register their challenges of the prospective jurors for cause. (Dec.Tr. at 46). Of those challenges relevant to this inquiry, plaintiffs sought to excuse two panel members. Plaintiffs challenged Member 28 for cause, arguing that her knowing East Hartford police officers and her grandfather having been a police officer affected her impartiality. (Dec.Tr. at 48). The challenge was denied (Dec.Tr. at 48), and Member 28 ultimately became a juror in the first case (Dec.Tr. at 53). Plaintiffs were successful in removing Member 34 for cause. Member 34 had expressed sufficient doubt about his law enforcement ties affecting his views on a lawsuit against police officers to justify his excusal for cause. (Dec.Tr. at 48–49).

With the benefit of the panel members' responses on the first *voir dire*, counsel selected a jury to hear this case. (Dec.Tr. at 55). No member of the panel responded to the question whether they would be unable to render a verdict based solely on the evidence presented at trial and the law as instructed. (Dec.Tr. at 58–59). Likewise, no prospective jurors responded to the

questions whether they held any bias or prejudice for or against police officers. (Dec.Tr. at 63–64, 65–66, 74–75). The court then posed a question about membership in law enforcement associations. (Dec.Tr. at 76–77). This question had been taken from plaintiffs' proposed *voir dire* and was not asked at the first jury selection. (Dec.Tr. at 89). One panel member ("Member 45") responded to the question, indicating his social membership in an interstate policeman's association for the past six to seven years. (Dec.Tr. at 77). According to Member 45, his social membership in the association would not prevent him from being impartial were he a juror in this case. (Dec.Tr. at 77). The court posed the final general question whether any of the panel, having heard all the questions, knew of any other reason why they could not sit on this jury and render a fair verdict. There was no response. (Dec.Tr. at 86).

Counsel in this case then approached the bench to register their challenges of the prospective jurors for cause. (Dec.Tr. at 86). Plaintiffs challenged two panel members for cause. Member 34, who had been excused for cause in first jury selection due to his possible partiality for law enforcement officers, again was excused. (Dec.Tr. at 87). Plaintiffs also challenged Member 45 for cause. Member 45 was a social member in a police association. (Dec.Tr. at 88). After the court expressed that it was being "liberal" in granting plaintiffs' challenge of Member 45 for cause, Member 45 was excused. (Dec.Tr. at 89–90).

The deputy clerk then placed the names of the remaining panel members in the wheel. After sixteen names were drawn, the parties each exercised three peremptory challenges. Two of plaintiffs' peremptory challenges were used to exclude Member 28 and Member 42. (See Civil challenge sheet dated Dec. 4, 1985). The names of six regular jurors and two alternate jurors were then drawn from the

---

**4.** Though the transcript credits another panel member with this statement, the court reporter, after examining his notes at the court's request, indicated that he had not accurately transcribed the number of the member who made this statement. Counsel's remarks in the challenge portion of jury selection correctly attribute the statement to Member 28. (Dec.Tr. at 48).

wheel. (Dec.Tr. at 92). Once the jury was impanelled, counsel indicated their satisfaction with the jury as selected. (Dec.Tr. at 92–93).

On Thursday, January 2, 1986, the six regular jurors and two alternate jurors were sworn moments before the trial in this case began.[5] The evidence portion of the trial ended on Tuesday, January 7. On January 8, counsel made closing arguments and the court instructed the jury. After the instruction, the two alternate jurors were excused. At 3:00 p.m. on the fifth day of trial, the jury retired to begin its deliberations. (See Civil Docket Sheet No. H–84–1082 ("Docket Sheet") at 5).

After deliberating for two hours, the jury returned to the courtroom. The foreperson was identified and asked whether the jury wished to either continue into the evening to finish or adjourn for the evening and return the next morning. (January 8, 9, 1986, Transcript ("Jan.Tr.") at 8–9 (filing no. 122)). The foreperson's response was "we're still reviewing the evidence that has been presented to us, and I don't think we could reach a verdict immediately." (Jan.Tr. at 9). The jurors were then cautioned "not to discuss the matter with anyone, friends, family, relatives, anyone." (Jan.Tr. at 10). The jurors were instructed to return directly to the jury room the next morning and resume their deliberations when all six jurors were present. (Jan.Tr. at 9–10).

On the following morning, six court days after the trial began, the court and counsel were presented with a unique and unwanted situation. This situation was thoroughly summarized by the court on that morning in a chambers conference with counsel.

This morning at about 9:15 I received a call from a captain in the Vernon Police Department who advised me that last night at approximately 10:00 o'clock [Juror 11], a member of the jury, was arrested by a Vernon police officer, charged with driving while under the influence of liquor, and during the course of that arrest and interrogation by the police officer, an officer in Vernon, [Juror 11] disclosed that he was a member of this jury, that the jury had been deliberating yesterday afternoon, and that he disclosed to the police officers conversations that had taken place in the jury room between the—amongst the jurors themselves, and in essence violated his oath as a juror and violated the sanctity of the jury deliberations.

As soon as counsel came into the building this morning I brought them into chambers, I disclosed this information to both counsel and told them that—advised them of the three alternatives that were available to them, as I indicated earlier in this conference.[6] I also told them that they should go out and talk between themselves and hopefully reach an agreement and then report back to me.

They both indicated that they wanted to make some telephone calls, both to their respective offices, and I assume to their clients, or both.

[Plaintiffs' counsel] has now reported that he's been unable to reach the partner in his firm with whom he wishes to talk. He's still trying to reach him.

I also indicated to counsel in that discussion that whatever resolution was reached would be by agreement.

---

**5.** The deputy clerk administered the following standard civil jury oath.

You do solemnly swear that you will well and truly try the issue or issues between the plaintiff(s) and the defendant(s), according to the law and evidence given you in court, and a true verdict give. You will speak nothing of the matters and business you have in hand except among yourselves, nor shall you suffer any person to speak to you concerning the same; and when you have agreed upon a verdict you will keep it secret until you deliver it up in court: So help you God.

**6.** The court proposed the following three alternatives: (1) permitting the five jurors to deliberate without Juror 11; (2) arranging for the return of the two alternates who would be questioned about their ability to impartially decide this case, and, if appropriate, permit the five jurors and one alternate to begin deliberations from the start; or (3) continuing with Juror 11, if possible. (Jan.Tr. at 11–12).

Now in this conference I have advised counsel that I have reconsidered that position and indicated that with the exception of going with five jurors, I'm considering the second and third alternatives, which if they cannot agree, I am considering doing on my own.

.     .     .     .     .

I also advised counsel that after I received the phone call from the Vernon Police Department, the clerk here in Hartford came in and told me that he had received a phone call this morning from [Juror 11] saying that he had car trouble and needed a ride in this morning, and he knew that one of his fellow jurors lived in his area and could he have his phone number. The clerk gave him the phone number of [Juror 24], who was another member of the jury, and it then developed that [Juror 11] called [Juror 24] and, in fact, [Juror 24] picked him up and gave him a ride in this morning.

The clerk reported to me that he questioned [Juror 11 who] is in a separate room, and that he questioned [Juror 24] and [Juror 24] told him that all [Juror 11] told him was that he had car trouble and they did not discuss the case on the way in this morning.

(Jan.Tr. at 16–19).

Both counsel indicated that the court's recapitulation of the events was accurate. (Jan.Tr. at 19).

When Juror 11 arrived at the courthouse, he had been separated from the jury and did not enter the jury deliberation room. He remained isolated in the clerk's office or in a separate room. (Jan.Tr. at 14). The five jurors remained in the jury room, having been told to refrain from deliberations. (Jan.Tr. at 14). At 11:45 a.m., one hour and forty-five minutes after the jury reported to the jury room, the court expressed its concern about the passage of time and the possibility of jury speculation. (Jan.Tr. at 14–15). Defense counsel was agreeable to proceeding with either an alternate or Juror 11, if possible. (Jan.Tr. at 15). However, plaintiffs' counsel would not agree to

either alternative until he spoke with a senior partner in his firm. (Jan.Tr. at 15).

With counsel's concurrence and input (Jan.Tr. at 20–21), the court addressed the five jurors at noon.

I wanted to bring you out and advise you that there is a problem that has developed this morning. I'm not going to indicate to you the nature of the problem, but suffice it to say that there is a problem which has developed that, as a result of which you have not been deliberating this morning. We're trying to resolve the problem and work it out with counsel, and so far we've been—we've not been successful because there are certain contacts that have to be made and people have not been able to be reached, but we're working on it.

The reason for my bringing you out now is simply to advise you of that fact so that you don't sit there wondering what's going on.

I will try to keep you advised as we go along and let you know what is happening. I don't think I should tell you any more at this point.

I think you've ordered lunch, so you'll be able to have your lunch and relax. You should not be deliberating; you should not be discussing the case; you should not be talking about it, because for our purposes your deliberations have been suspended until such time as we are able to resolve this problem.

So with that, I'm going to excuse you again, send you back in. I hope that you have enough to read. I hope you have enough to eat, and I'm sure you'll find things to talk about other than this case.

So we'll hopefully see you again soon and report to you on our progress. Thank you for your patience. I appreciate it.

(Jan.Tr. at 21–22).

Both counsel indicated that they had no objection to that statement. (Jan.Tr. at 22–23).

At 1:40 p.m. the situation worsened. Defense counsel informed the court and plaintiffs' counsel during an on-the-record cham-

bers conference that he had just become aware of an unsolicited telephone call to his client from an officer in the Vernon Police Department. During this telephone call, a Vernon police officer disclosed to defendants what he understood to be the status of the jury's deliberations. (Jan.Tr. at 24). The officer's disclosure was apparently based on statements Juror 11 made while in the Vernon Police Department's custody. Plaintiffs' counsel, though unaware of the purported status of the jury's deliberations, now was aware of a juror's contact with a third-party. (Jan.Tr. at 26–27). The court deferred resolving how to proceed until plaintiffs' counsel could speak with a partner in his firm. (Jan.Tr. at 28).

Plaintiffs' counsel attended the next chambers conference with the benefit of having spoken with senior counsel. At the outset of the conference, plaintiffs' counsel was told what the court and defense counsel knew with respect to where the jury apparently stood in its deliberations. This was done to avoid any unfairness in allowing plaintiffs' counsel to commit his clients to one of the three alternatives without the benefit of knowing what defense counsel knew. (Jan.Tr. at 29, 30). The court informed counsel that

> [m]y information, and the source of that information is the one telephone call that I had this morning from the Captain of the Vernon Police Department, and I've had no other contact with him since that one call, nor with anyone else—the information that he told me, gave to me with respect to what [Juror 11] told the Vernon police officers was that it was five to one in favor of a plaintiffs' verdict, and that there was one hold-out, a woman, who was holding out for the defendants, but that they thought they could bring her around and that there would be a plaintiffs' verdict.

(Jan.Tr. at 29–30)

In view of this recent development, plaintiffs' counsel once again was provided with time to contact his senior counsel. (Jan.Tr. at 31). After plaintiffs' counsel contacted counsel, the chambers conference reconvened. Counsel were asked how they wished to proceed. (Jan.Tr. at 31). Understandably, counsel for plaintiffs responded that he would be "more than happy to go forward with the five jurors we have at present." (Jan.Tr. at 32). Conversely, defendants' counsel was not willing to proceed with five jurors. The third alternative of proceeding with Juror 11 was explored. Predictably, plaintiffs' counsel said "I'd be more than happy to" proceed with Juror 11. (Jan.Tr. at 32). Defense counsel, however, rejected this alternative. (Jan.Tr. at 32).[7]

Absent counsel's consent to proceed with the five jurors or the five jurors plus an alternate, the court undertook the third alternative of investigating whether Juror 11's ability to impartially decide this case had been affected by the events of the previous evening. Counsel submitted questions which, with the exception of one question, were put to Juror 11. (Jan.Tr. at 46, 53–54). The *voir dire* of Juror 11 occurred in the presence of counsel and was simultaneously recorded. Prior to the questioning, Juror 11 was told that the transcript of the examination would be sealed and that his answers would not be used in any state court proceeding in which he might be involved. (Jan.Tr. at 36). Also, Juror 11 was told that the inquiry was merely to determine whether he was able to continue as a juror and rejoin the jury to complete deliberations. (Jan.Tr. at 40, 42). He then unhesitatingly answered the questions asked of him.

Juror 11 indicated clearly that although he thought his arrest for driving under the influence was unjustified (Jan.Tr. at 39), his contact with the Vernon Police Department would not affect his ability to decide this case fairly and objectively. (Jan.Tr. at 42, 43). Juror 11 said that when he told the arresting officer about his sitting as a

---

7. After counsel thought that the jury's verdict would be in plaintiffs' favor, counsel met on their own, entering into extensive settlement discussions. The court was informed that defendants' settlement offers were substantial. Plaintiffs, perhaps overcome by the prospect of victory, declined all offers.

juror on a civil case involving a police officer, the officer asked him about the case and whether it involved Officer Bradrick, a defendant in this case. (Jan.Tr. at 36, 45). According to Juror 11, he did not discuss much of the case with the officer during their five minute conversation (Jan.Tr. at 38), except to say that

"[w]e're in deliberation now," and I also said that I felt that the case had already been decided, but there was like two women—two women that I knew that were on the jury and they, in deliberation, and we voted on the points that were made twice, and everybody agreed, but they decided they wanted to come back tomorrow because of other reasons besides the verdict. Some people, an extra $30 a day means something. To me it's not, rather than getting paid. And they felt, we got—to me, it's done. We were done an hour or so, an hour and a half when we came in here.

(Jan.Tr. at 37).

Juror 11 went on to say that in answering the Vernon police officer's inquiry, he told the officer that he thought the defendants "were probably not liable." (Jan.Tr. at 38). The juror was told that the court considered his conversation with the Vernon police officer a serious matter in view of his oath not to discuss the case with others. (Jan.Tr. 41–42). Yet Juror 11 sincerely testified that this conversation with the one police officer occurred because the officer "asked me, and under those circumstances, you know, it was like I answered ... what the policeman said. He's an authority, and under those circumstances— [.]" (Jan.Tr. at 44).

Juror 11 also was questioned about his morning ride to the courthouse with Juror 24. He said that during the car ride they had not discussed the substance of the case and he had not disclosed his misadventures with the Vernon police. (Jan.Tr. at 43–44).

At two points in the *voir dire* hearing, Juror 11 disclosed that he had one or more relatives who were police officers. At one point he said his cousin was a police officer in Bristol (Jan.Tr. at 36) and at another

point he said several relatives were police officers (Jan.Tr. at 45). No questions were asked about his relatives.

Based on Juror 11's candid responses, the court concluded (1) that his arrest and subsequent contact with a police officer would not influence his decision or views in the case, (2) that he had not discussed this case with anyone but the one police officer, (3) that he could still decide the case fairly and objectively, (4) that he could deliberate fully and fairly with the other jurors, and (5) that he would continue to follow the court's instructions. (Jan.Tr. at 42–43, 45). Because the previous night's events had not affected Juror 11's ability to impartially decide this case, he would resume deliberations with the other jurors. (Jan.Tr. at 46, 50). Juror 11 was then cautioned not to discuss with the other jurors his arrest and contact with the Vernon Police Department, why he had been absent from the jury room, and the proceedings which just occurred in chambers. (Jan.Tr. at 48–49).

The court then entertained the parties' motions in the courtroom. Plaintiffs' counsel, now knowing the unfavorable disposition of the jury to plaintiffs' case, predictably reversed his prior position to proceed with Juror 11, moving for a mistrial. Counsel argued that juror misconduct, juror prejudice and bias, the right to six jurors, and the prejudicial effect of the passage of time on the jury, dictated a mistrial. (Jan.Tr. at 50–52). Defense counsel also moved for a mistrial. Counsel asserted that Juror 11's belief that he was improperly arrested was inflammatory and that the Vernon officer's inquiry of Juror 11 regarding one of the defendant officers was prejudicial. (Jan.Tr. at 52–53). Given the extensive *voir dire* of Juror 11 which amply demonstrated his impartiality and competence to participate in the jury's deliberations, both motions were denied. (Jan.Tr. at 53–54).

Juror 11 joined the other jurors in the courtroom at 4:34 p.m. (See Docket Sheet at 5). The jury was instructed that it was to continue to deliberate and to find the facts and to apply the law as I gave it to

you in my charge yesterday to those facts and to reach a verdict, not to speculate or guess in any way as to why there's been a delay during the day and why [Juror 11] hasn't been with you. (Jan.Tr. at 55).

At 4:36 p.m. the six jurors were excused to resume their deliberations with the instruction to begin deliberating at the point where they ended the previous evening. (Jan.Tr. at 56). At 5:15 p.m., after deliberating less than 45 minutes, the jury entered the courtroom with verdict in hand. (See Docket Sheet at 5). The verdict was for the defendants. (See completed six-page Verdict Form).

## DISCUSSION

### I. *Right to An Impartial Jury*

A civil litigant's right to a trial by an impartial jury is guaranteed by the United States Constitution. Although the seventh amendment preserves "the right of trial by jury" in civil cases, it does not expressly provide for the jury's impartiality. Yet the impartiality of the jury "is inherent in the right of trial by jury and is implicit in the requirement of the fifth amendment that '[n]o person shall ... be deprived of life, liberty, or property, without due process of law.'" *Kiernan v. Van Schaik*, 347 F.2d 775, 778 (3rd Cir.1965). *See also McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 554, 104 S.Ct. 845, 849, 78 L.Ed.2d 663 (1984) (plurality opinion) ("*McDonough*") ("[o]ne touchstone of a fair trial is an impartial trier of fact").

▉ It is the role of a district court to safeguard a litigant's constitutional right to an impartial jury during all stages of trial, commencing with jury selection and ending when the jury returns its verdict. *See Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) ("*Phillips*"). "Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Id.*

Only when the jury's collective judgment is the product of a trial by an impartial trier of fact, capable and willing to follow the law and render an impartial verdict on the evidence, is this constitutional right guaranteed. *See United States v. Powell*, 469 U.S. 57, 66–67, 105 S.Ct. 471, 477–78, 83 L.Ed.2d 461 (1984) ("*Powell*"); *Phillips*, 455 U.S. at 217, 102 S.Ct. at 946.

As a general rule, "once the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment." *Powell*, 469 U.S. at 67, 105 S.Ct. at 478. Stating that this jury finality rule applies with "few exceptions," the Court in *Powell* cited two juror misconduct cases as exceptions. *Id., citing McDonough*, 464 U.S. at 556, 104 S.Ct. at 850 (juror's non-disclosure on *voir dire* during jury selection in civil action); *Phillips*, 455 U.S. at 217, 102 S.Ct. at 946 (juror's potential bias due to his conduct during a criminal trial). As this decision will review, juror misconduct which occurs during jury selection or trial may jeopardize the valued right to an impartial jury.

### II. *A New Trial*

A litigant, according to numerous Supreme Court decisions, "'is entitled to a fair trial but not a perfect one,' for there are no perfect trials." *McDonough*, 464 U.S. at 553, 104 S.Ct. at 848 (quoting *Brown v. United States*, 411 U.S. 223, 231–32, 93 S.Ct. 1565, 1570, 36 L.Ed.2d 208 (1973), which quotes *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620, 1627, 20 L.Ed.2d 476 (1968) and *Lutwak v. United States*, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593 (1953)). Accordingly, district courts are admonished by Rule 61 of the Federal Rules of Civil Procedure to "disregard any error or defect in the proceeding which does not affect the substantial rights of the parties." *See McDonough*, 464 U.S. at 553, 104 S.Ct. at 848 ("The harmless-error rules adopted by this Court and Congress embody the principle that courts should exercise judgment in preference to the automatic reversal for

'error' and ignore errors that do not affect the essential fairness of the trial.").

■ A district court may not disregard a jury verdict by granting a new trial "unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." 11 C. Wright & A. Miller, *Federal Practice and Procedure: Civil* Section 2803 at 32 (1973 & Supp.1986). *See Milos v. Sea-Land Service, Inc.,* 478 F.Supp. 1019, 1021 (S.D.N.Y. 1979), *aff'd mem.,* 622 F.2d 574 (2d Cir.), *cert. denied,* 449 U.S. 954, 101 S.Ct. 360, 66 L.Ed.2d 219 (1980). A new trial is a drastic remedy. *See Dixon v. Maritime Overseas Corp.,* 490 F.Supp. 1191, 1194 (S.D.N.Y.), *aff'd mem.,* 646 F.2d 560 (2d Cir.1980), *cert. denied,* 454 U.S. 838, 102 S.Ct. 145, 70 L.Ed.2d 120 (1981).

■ In passing on a motion for a new trial, a district court exercises broad discretion. *See McDonough,* 464 U.S. at 556, 104 S.Ct. at 850; *Allied Chemical Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 190, 66 L.Ed.2d 193 (1980) (per curiam); *Bevevino v. Saydjari,* 574 F.2d 676, 684 (2d Cir.1978). Similarly, where an appeal is based on juror misconduct, a "trial judge's handling of alleged juror misconduct or bias is only reviewable for abuse of discretion." *United States v. Weiss,* 752 F.2d 777, 783 (2d Cir.) (quoting *United States v. Panebianco,* 543 F.2d 447, 457 (2d Cir.1976), *cert. denied, Anatala v. U.S.,* 429 U.S. 1103, 97 S.Ct. 1128, 1129, 51 L.Ed.2d 553 (1977)), *cert. denied,* — U.S. —, 106 S.Ct. 308, 88 L.Ed.2d 285 (1985). *See also McDonough,* 464 U.S. at 559, 104 S.Ct. at 851 (Brennan, J., concurring); *United States v. Diez,* 736 F.2d 840, 845 (2d Cir. 1984).

Observant of those principles on the litigant's right to an impartial jury and the appropriateness of a new trial, the two grounds of juror misconduct upon which plaintiffs base their motion for a new trial will be closely examined. The first ground concerns Juror 11's contact with a third-party, who was not involved with this trial, while the jury had recessed its deliberations for the evening. The second ground concerns the same juror's non-disclosure during jury selection *voir dire* that he had relatives who were police officers.

### III. *Juror's Contact With a Third-Party*

The first ground upon which plaintiffs base their motion is that Juror 11 was prejudiced by his contact with a third-party during the evening recess in the jury's deliberations. This alleged juror misconduct, purportedly deprived plaintiffs of a fair trial. *See* Plaintiffs' Memorandum in Support of Their Motion for New Trial ("Plaintiffs' Memorandum") at 1–10.

On the morning of January 9 when the court first learned that Juror 11 had contact with a third person, the court met with counsel in an on-the-record chambers conference to discuss how to proceed with the case. Unable to receive counsel's consent to proceed with the two alternatives posed by the court of either using five jurors or recalling an alternate, the court followed our court of appeals' guidance in conducting an investigation as to whether a contacted juror's ability to impartially decide a case had been adversely affected. *See United States v. Aiello,* 771 F.2d 621, 629 (2d Cir.1985) ("*Aiello*").

In *Aiello,* the Court of Appeals for the Second Circuit reviewed a claim that a district judge's actions in investigating an unidentified third-party's communication with a juror about a case pending before the juror deprived the criminal defendants of a fair trial. The district court conducted a plenary hearing in which defense counsel, but not the defendants, participated. On appeal, the hearing was held to have adequately ensured the defendants' right to a fair trial. *Id.* at 629–30.

The Second Circuit recognized that a trial court confronted with investigating an unauthorized third-party contact with a juror has wide discretion in the extent and manner of the investigation, largely dependent on the circumstances attending the contact. *Id.* at 629. A trial court was expressly advised to hold a *voir dire* hearing in the presence of counsel, but out of the jury's presence, where the juror or jury is ques-

tioned and the inquiry is simultaneously recorded. *See id., quoting Remmer v. United States*, 347 U.S. 227, 229–30, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (" 'The trial court should not decide and take final action *ex parte* [on information that a third party has contacted a juror], but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate.' ").[8]

▮ Although the situation here concerned a juror's contact with a third-party rather than a third-party's unauthorized contact with the juror, the advice in *Aiello* was nonetheless applicable. The court conducted a *voir dire* hearing of Juror 11 in chambers and in counsel's presence. The hearing was simultaneously recorded. Using questions submitted by counsel, with the exception of plaintiffs' question seeking the third-party's name, the court questioned Juror 11 on the circumstances and extent of his contact with the Vernon police

officer. Based upon a review of the record, including Juror 11's candid answers about the circumstances attending his contact with a police officer, the court finds now, as it did after the *voir dire* hearing, that Juror 11 had not been prejudiced by this contact and that he retained his ability to impartially decide the case solely on the evidence before him and the law as instructed. Plaintiffs have presented nothing to alter this finding.

▮ In support of their allegation of juror prejudice, plaintiffs contend that they are entitled to a presumption that Juror 11 was prejudiced as a result of his contact with a third-party. *See* Plaintiffs' Memorandum at 1–2, 7–8. As authority for the presumption of prejudice, they rely on *Mattox v. United States*, 146 U.S. 140, 150, 13 S.Ct. 50, 53, 36 L.Ed. 917 (1892) and two Sixth Circuit decisions.[9] Under the circumstances here, a presumption of juror prejudice is not relevant to the inquiry of Juror 11's retention of impartiality.[10] However,

---

**8.** The Second Circuit also has had occasion to review an allegation of juror misconduct similar to what is alleged here. *See United States v. Diez*, 736 F.2d 840 (2d Cir.1984). In *Diez*, a juror's contact with a third-party during a weekend recess in a criminal trial was at issue. The district court learned of the contact while the jury was deliberating and after the jury had indicated in a note that it was near a partial verdict. The court deferred inquiry into the contact until after the verdict was returned. Upon questioning the juror with counsel's aid, the court and parties were told that the contact occurred in a neighborhood bar and merely consisted of the juror telling a law enforcement officer not assigned to the case on trial that he was a juror in a case in which two agents were witnesses. The juror asked the officer whether he knew the agents and the officer said he did. The district court dismissed the allegation of juror misconduct as frivolous.

On an appeal which challenged the timing and substance of the district court's inquiry of juror misconduct, the Second Circuit found no abuse of discretion. However, with respect to the timing of the inquiry, the Second Circuit suggested that "in the ordinary case it would probably be preferable to conduct a taint hearing as promptly as possible." *Id.* at 845.

**9.** The two Sixth Circuit decisions plaintiffs rely on are *Krause v. Rhodes*, 570 F.2d 563 (6th Cir.1977), *cert. denied*, 435 U.S. 924, 98 S.Ct.

1488, 55 L.Ed.2d 517 (1978) and *Stone v. United States*, 113 F.2d 70 (6th Cir.1940). Those decisions are of little precedential value in the Sixth Circuit in light of that circuit court's recent decision which expressly declined to apply the presumptive prejudice standard. *See United States v. Pennell*, 737 F.2d 521, 532 (6th Cir. 1984) (after *Phillips*, "the burden of proof rests upon a defendant to demonstrate that unauthorized communications with jurors resulted in actual juror partiality. Prejudice is not to be presumed.") (footnote omitted), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985)). *See also United States v. DeLutis*, 722 F.2d 902, 909 (1st Cir.1983) (interpreting *Phillips* to mean that a criminal defendant must prove actual bias because bias will not be presumed). *But see Pennell*, 737 F.2d at 538–40 (Celebrezze, J., dissenting).

**10.** The presumption of prejudice doctrine is that any unauthorized contact with a juror during a criminal trial is *presumptively prejudicial to* a defendant unless the government shows that the contact was harmless to the defendant. *Remmer v. United States*, 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954); *Mattox v. United States*, 146 U.S. 140, 148–50, 13 S.Ct. 50, 52–53, 36 L.Ed. 917 (1892). The Supreme Court has held that "the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias." *Phillips* 455 U.S. at 215, 102 S.Ct. at 944. *Phillips* is

even affording plaintiffs the initial presumption that Juror 11 was prejudiced as a result of his contact with a Vernon police officer, Juror 11's answers at the post-contact *voir dire* examination that the contact had not adversely affected his ability to impartially decide the case sufficiently rebuts a presumption of prejudice. The court finds now, as it did at the conclusion of the *voir dire* hearing, that Juror 11 was not prejudiced by his contact with a third-party and that Juror 11 remained able and willing to render an impartial verdict. Juror 11's testimony on the circumstances and extent of the contact is not inherently suspect, *Phillips*, 455 U.S. at 217 n. 7, 92 S.Ct. at 946 n. 7; *United States v. Diez*, 736 F.2d at 845, and his assurances of continued impartiality are properly credited in determining whether he retained his impartiality, *United States v. Pennell*, 737 F.2d 521, 533 (6th Cir.1984), *cert. denied*, 469 U.S. 1158, 105 S.Ct. 906, 83 L.Ed.2d 921 (1985). If this finding is reasonable, it is entitled to deference on appeal. *See Aiello*, 771 F.2d at 630.[11] Moreover, plaintiffs have not directed the court to anything which would indicate that the contact affected Juror 11's impartiality.

Here, a juror's contact with a third-party who was not involved in this litigation neither touched on the merits of the case nor involved any threats to the jury. The occurrence or the nature of the contact had not been communicated to the other jurors. Therefore, no facts exist to support an assertion that either Juror 11's contact or the morning's events affected the other jurors' impartiality.[12] Without minimizing the importance of jurors abiding by their oath not to discuss the case with anyone and the seriousness of Juror's 11 violation of that oath, Juror 11's conduct in discussing the nature of the jury's deliberations with a police officer who had arrested him is mitigated by the fact that the discussion was precipitated by questions from the officer. Juror 11 credibly testified that his comments to the officer about the jury's deliberations were in direct response to an inquiry by someone whom he perceived as an authority figure.

Therefore, Juror 11's assurances of both impartiality and the inconsequential effect of the contact on his views of this case, unequivocally dispose of any possible claim of prejudice. Juror 11's retention of impartiality permitted him to rejoin the other jurors and continue deliberating.[13]

a juror misconduct case which involved an allegation of juror partiality stemming from the juror's application for a job with the district attorney's office during a criminal trial.

In this case, the court, with the aid of counsel, conducted a post-contact *voir dire* examination of Juror 11 to determine whether he remained impartial following his contact with a third-party. No juror bias or prejudice was shown. Moreover, the circumstances attending Juror 11's contact with a third-party do not mandate a finding that the juror was impliedly biased. *See id.* at 221–25, 102 S.Ct. at 948–50 (O'Connor, J., concurring); *McDonough*, 464 U.S. at 556–57, 104 S.Ct. at 850 (Blackmun, J., concurring).

11. Appellate courts uniformly agree that it is the trial judge who is in the best position to determine a juror's ability to serve impartially. *See, e.g., Patton v. Yount*, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847 (1984); *McDonough*, 464 U.S. at 556, 104 S.Ct. at 850 (1984); *id.* at 559, 104 S.Ct. at 851 (Brennan, J., concurring); *United States v. Aiello*, 771 F.2d 621, 629 (2d Cir.1985); *United States v. Bufalino*, 576 F.2d 446, 451–52 (2d Cir.), *cert. denied*, 439 U.S. 928, 99 S.Ct. 314, 58 L.Ed.2d 321 (1978).

12. Plaintiffs contend that the other jurors were adversely affected because "[f]ive members of the jury were in the jury room for over six hours under instructions that they could not deliberate." Plaintiffs' Memorandum at 8–9. First, this unexpected temporary delay in deliberations was not excessive. Second, the jury was instructed that a problem had developed and cautioned not to deliberate or discuss the case. Finally, plaintiffs seem to forget that the deliberations were temporarily suspended to determine how to proceed with the case. The delay was exacerbated by plaintiffs' counsel's inability to contact a senior partner for advice and his unwillingness to choose one of the alternatives posed by the court until the contact had been made. (Jan.Tr. at 11, 15, 28, 31).

13. Plaintiffs attempt to bolster their claim of juror misconduct with two additional instances involving Juror 11. *See* Plaintiffs' Memorandum at 5–6. The first instance concerns the possibility of a prejudicial conversation between Juror 11 and Juror 24 while the two shared a ride to the courthouse on the morning after Juror 11's arrest by the Vernon Police Department. Juror 11 credibly testified at the *voir dire* hearing that while he and Juror 24 were driving

Finally, one fact severely discredits and compromises plaintiffs' present claim. Prior to Juror 11's *voir dire*, and when the morning's events indicated that the verdict was to be in plaintiffs' favor, plaintiffs' counsel would let nothing, including Juror 11's misadventures with the Vernon police, hamper the jury's continued deliberations. Knowing of Juror 11's contact with a police officer as a result of being arrested, the same third-party contact plaintiffs now argue denied them a fair trial, plaintiffs ignored the contact in eagerly agreeing to allow jury deliberations to continue with Juror 11. (Jan.Tr. 32).

This court's task was to ensure that the jury's collective judgment was the product of a trial by an impartial trier of fact capable and willing to follow the law and render an impartial verdict on the evidence. *See Powell,* 469 U.S. at 66–67, 105 S.Ct. at 478; *Phillips,* 455 U.S. at 217, 102 S.Ct. at 946. That task was discharged when the court, upon learning that a juror had a possibly prejudicial contact with a third-party, promptly undertook, with the aid of counsel, to *voir dire* the juror on the prejudicial effect, if any, of the contact. The juror's unexpected contact with a person not involved in this case did not compromise the juror's impartiality so as to violate plaintiffs' right to an impartial jury. Recognizing that "due process does not require a new trial every time a juror has been placed in a potentially compromising

situation," *Phillips,* 455 U.S. at 217, 102 S.Ct. at 946, in view of the circumstances in this case, a new trial is not warranted.

## IV. *Juror's Non-Disclosure At Jury Selection*

The second ground upon which plaintiffs base their motion for a new trial is that Juror 11 failed to disclose his familial relationship with law enforcement officers on *voir dire* during jury selection. They argue this non-disclosure constitutes misconduct which deprived them of a fair trial and which entitles them to a new trial. *See* Plaintiffs' Memorandum at 10–13; Plaintiffs' Reply Memorandum in Support of Their Motion for New Trial ("Plaintiffs' Reply Memorandum"). At first glance the second ground for a new trial is seductively attractive. However, the ground does not withstand either legal or factual scrutiny.

■ As discussed earlier, litigants have a right to a trial by impartial jurors capable and willing to decide their case solely on the evidence. *McDonough,* 464 U.S. at 554, 104 S.Ct. at 849; *Phillips,* 455 U.S. at 217, 102 S.Ct. at 946. The time-honored and prescribed method of ensuring that right is *voir dire* examination of prospective jurors. *See United States v. Dennis,* 183 F.2d 201, 227 (2d Cir.1950) (Hand, J.), *aff'd,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951).[14] The purpose of *voir dire* is

---

in that morning, he did not tell Juror 24 about his misadventures of the previous evening nor did they discuss the substance of the case. (Jan.Tr. at 43–44). This was confirmed by Juror 24's statements to the court clerk that morning. (Jan. Tr. 14, 19). There is no reason to doubt Juror 11's testimony. The second instance of Juror 11's alleged misconduct concerns his mentioning the case to a former college friend on the evening the jury had recessed its deliberations. (Jan.Tr. at 39–40). This instance became known when Juror 11 was explaining the circumstances surrounding his arrest.

Any allegation that these two instances somehow affected the fair resolution of this case is simply speculative. Under the circumstances of this case, speculation is insufficient reason to upset the verdict. *See, e.g., Dunn v. United States,* 284 U.S. 390, 394, 52 S.Ct. 189, 191, 76 L.Ed. 356 (1932). *See generally* 6A *Moore's Fed-*

*eral Practice* para. 59.08[4] at 59–115 (2d ed. 1986).

**14.** Rule 47(a) of the Federal Rules of Civil Procedure grants the court considerable discretion in handling the *voir dire* examination of prospective jurors. That Rule provides that:

The court may permit the parties or their attorneys to conduct the examination of prospective jurors or may itself conduct the examination. In the latter event, the court shall permit the parties or their attorneys to supplement the examination by such further inquiry as it deems proper or shall itself submit to the prospective jurors such additional questions of the parties or their attorneys as it deems proper.

In this case, the court examined the jury panel with those written *voir dire* questions counsel submitted prior to jury selection in accordance with this district's local rules. *See* Local Rule 12(c), R.Civ.P. (D.Conn.). Plaintiffs neither

to expose possible biases, both actual or implied, on the part of the prospective jurors who for one reason or another may be unwilling or unable to impartially discharge their duty. *See Powell,* 469 U.S. at 66–67, 105 S.Ct. at 477–78, *United States v. Wood,* 299 U.S. 123, 133, 57 S.Ct. 177, 179, 81 L.Ed. 78 (1936) ("The bias of a prospective juror may be actual or implied; that is, it may be bias in fact or bias conclusively presumed as [a] matter of law."); *United States v. Barnes,* 604 F.2d 121, 140 (2d Cir.1979) (protection of a criminal defendant's substantial rights by "a *voir dire* designed to uncover bias as to issues in the cases and as to the defendant himself"), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). A critical ingredient in the *voir dire* process is responsive and truthful answers by prospective jurors to questions which sufficiently ask about a subject sought to be disclosed. *See McDonough,* 464 U.S. at 554, 104 S.Ct. at 849. A juror whose answer demonstrates an actual bias is subject to challenge for cause. *See United States v. Perkins,* 748 F.2d 1519, 1532–33 (11th Cir.1984). Under statutory law, the court decides whether a juror is excused for cause.[15] However, where a party suspects a prospective juror of bias or prejudice against his case, the litigant may assert his statutory right of a peremptory challenge without explanation. *See Swain v. Alabama,* 380 U.S. 202, 220, 85 S.Ct. 824, 835, 13 L.Ed.2d 759 (1965); *Carr v. Watts,* 597

F.2d 830, 832 (2d Cir.1979) (per curiam) (commenting on the right of peremptory challenges).

At the jury selection in this action and in another section 1983 civil rights action, prospective jurors were asked numerous questions to expose possible biases on their part. Most of the questions posed to the jury panel were from the parties' written submissions of proposed *voir dire.* The question critical to this inquiry of juror non-disclosure was: "Has anyone here or anyone close to you, any member of your family, ever been employed as a police officer or by any law enforcement agency?" (Dec.Tr. at 28).[16]

As initially discussed, a juror's failure to honestly respond to a material question during jury selection *voir dire* may provide a ground upon which a litigant need not accept the jury's collective judgment and, therefore, may be entitled to a new trial. *Powell,* 469 U.S. at 67, 105 S.Ct. at 478, *citing McDonough,* 464 U.S. at 556, 104 S.Ct. at 850. In *McDonough,* the Supreme Court was presented with an opportunity to establish a standard for determining when juror non-disclosure at *voir dire* necessitates a new trial. There, the plaintiff sued for being injured by a power lawnmower manufactured by the defendant. On *voir dire* of prospective jurors, the jury panel was asked whether they or any member of their immediate family had sustained a severe injury. A prospective

challenge the extent to which the prospective jurors were questioned nor the manner in which the jurors were questioned and selected.

15. The federal statute on challenges at jury selection in civil actions, 28 U.S.C. Section 1870, provides that:

> In civil cases, each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.
>
> All challenges for cause or favor, whether to the array or panel or to individual jurors, shall be determined by the court.

16. The question posed at jury selection was more exacting than the question plaintiffs proposed prior to jury selection. Plaintiffs' pro-

posed *voir dire* question merely asked "[h]ave you or anyone else close to you ever been employed as a policeman or by any law enforcement agency in any capacity?" *See* Plaintiffs' Proposed *Voir Dire* Questions para. 4 (filing no. 100). The actual question posed to the jury panel not only inquired whether anyone close to them was employed in law enforcement, but more specifically inquired whether any member of their "family" had ever been employed as a police officer or by any law enforcement agency.

Although the question asked was more specific than plaintiffs' proposed question, it was vague as to whether the word family meant not only members of the immediate family but relatives.

juror, who later became not only a member of the jury but the foreperson, did not respond to the question. After a three-week trial which ended in a plaintiff's verdict, defendant learned that the juror's son had earlier been injured by a truck tire explosion. Defendant's motion for a new trial grounded on the juror's failure to answer the question was denied by the district court. On appeal, the Court of Appeals for the Tenth Circuit reversed the district court. The circuit court held that a new trial was necessary to cure the prejudice to plaintiff's right of peremptory challenge caused by the juror's failure to affirmatively respond to the question posed on *voir dire*. *See Greenwood v. McDonough Power Equipment, Inc.*, 687 F.2d 338, 343 (10th Cir.1982) (Where "an average prospective juror would have disclosed the information, and that information would have been significant and cogent evidence of the juror's probable bias, a new trial is required to rectify the failure to disclose it," even assuming the juror's failure to answer on *voir dire* was unihtentional or a result of misunderstanding the question.).

The Supreme Court, in reversing the circuit court, held that a juror's failure to disclose information on *voir dire* will not give rise to a new trial unless the party's right to an impartial jury was denied. *McDonough*, 464 U.S. at 549, 104 S.Ct. at 846.[17] For purposes of determining whether a party has been denied the right to an impartial jury and, therefore, is entitled to a new trial, a plurality of the Court set forth a two-part test.

[A] party must first demonstrate that a juror failed to answer honestly a material question on *voir dire,* and then further show that a correct response would have provided a valid basis for a challenge for cause.

*Id.* at 556, 104 S.Ct. 850.

The Court's logic is that while various reasons may motivate a juror to conceal information on *voir dire*, "only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." *Id.*

■■■ In this case, plaintiffs fail to prove either part of the *McDonough* two-part test. The first part of the test is that Juror 11 "failed to answer honestly a material question." No debate exists as to the materiality of the question "[h]as anyone here or anyone close to you, any member of your family, ever been employed as a police officer or by any law enforcement agency." In an action against police officers for allegedly violating plaintiffs' civil rights, knowing whether a prospective juror himself, his family members, or someone close to him is or was in law enforcement is unquestionably material to exposing possible biases and ensuring a trial by impartial jurors.

However, there is no basis to support a finding that Juror 11 failed to honestly answer this question. Of those prospective jurors who responded to this question, the juror had either a brother, son, or grandfather who was involved in law enforcement,

---

**17.** *McDonough* is a plurality opinion authored by Justice Rehnquist. Justice Blackmun, in a separate concurring opinion, with whom Justices Stevens and O'Connor joined, wrote to assure that "regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias, or in exceptional circumstances, that the facts are such that bias is to be inferred." *McDonough*, 464 U.S. at 556–57, 104 S.Ct. at 850 (citing *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982)). Justice Brennan, with whom Justice Marshall joined, wrote separately, concurring in only the judgment. *Id.* at 557–59, 104 S.Ct. at 850–51.

Justice Brennan agreed that a new trial is not required where less than complete information was available to counsel at *voir dire*. *Id.* at 557, 104 S.Ct. at 850. Yet Justices Brennan and Marshall did not join in the adoption of the two-part juror non-disclosure test for determining whether a party is entitled to a new trial. Instead, Justice Brennan wrote that a new trial is warranted when a litigant demonstrates that "the juror incorrectly responded to a material question on *voir dire*, and that, under the facts and circumstances surrounding the particular case, the juror was biased against the moving litigant." *Id.* at 557–58, 104 S.Ct. at 850–51 (citing as an example *McCoy v. Goldston*, 652 F.2d 654, 659–60 (6th Cir.1981)).

or had himself been involved in law enforcement. Those responses indicate that the panel members interpreted the question to include only members of their immediate family. No prospective juror disclosed that any family members outside of their immediate family were law enforcement officers. The words "anyone close to you" or "any member of your family" used in the question are vague as to whether the question seeks information on family members outside the juror's immediate family. Quite simply, the question fails to sufficiently inquire into the subject of prospective jurors having relatives who are involved in law enforcement. Juror 11, having heard the question and the answers of the other prospective jurors, conceivably may not have thought of his relatives either because he did not consider them as part of his family or he is not close to them. Therefore, the juror's silence was an honest answer to the question.[18]

At one point during the selection of the first jury, and after the question about family members in law enforcement was asked, a panel member, Member 28, interjected that she knew a couple of police officers on the same police force on which the defendant officers served. That response was not prompted by the question at issue here, rather it resulted from Member 28's concern that a police officer she knew might be a trial witness. An additional example of the question's vagueness is that during *voir dire* in this case, the court asked a specific question about prospective jurors' affiliations with a club or organization involved with law enforcement. This police association question had not been asked while selecting the first jury. A panel member, Member 45, who had yet to respond to any of the numerous questions about ties to those in law enforcement posed in the course of the two jury selections, replied that he was a member of a police association.

Member 45's answer, and the varied responses to the question at issue, are testimony to the fact that prospective jurors are seldom expert in the meanings of words or the art of grammatical construction. *See McDonough,* 464 U.S. at 555, 105 S.Ct. at 849; *Orenberg v. Thecker,* 143 F.2d 375, 377 (D.C.Cir.1944). A juror's failure to understand the full meaning of an unclear question is not comparable to intentional misrepresentation. That is true "even though relevant and pertinent information concerning the juror is not made available to the court and counsel, and even though it would have been preferable to have the information available." *Bal Theatre Corp. v. Paramount Film Distributing Corp.,* 206 F.Supp. 708, 721 (N.D.Cal. 1962). *See McDonough,* 464 U.S. at 555, 105 S.Ct. at 849.

In addition, any imprecision in the question should have been corrected by the court or the parties and should not now form the basis for a finding that Juror 11 failed to honestly disclose the fact that his relatives were police officers. *See Hard v. Burlington Northern R.R.,* 618 F.Supp. 1463, 1466 (D.Mont.1985) (where a district court, in denying a motion for new trial based on a juror's failure to disclose on *voir dire* his former employment by defendant, found that the juror's failure to answer was in part due to its failure to clarify the question). No evidence exists here to support a claim that Juror 11 sought to deceive the parties or the court. Had Juror 11 sought to conceal the fact that he had relatives who were police officers, there is no logical reason why he gratuitously disclosed that information at his post-contact *voir dire* examination. A new trial motion grounded on pure speculation that a juror possibly misrepresented

---

**18.** A district court was affirmed in its denial of a motion for a post-verdict evidentiary hearing on alleged misrepresentations by a juror who on *voir dire* did not disclose that she was married to a former law enforcement officer. *United States v. Kerr,* 778 F.2d 690, 694 (11th Cir.1985). The Eleventh Circuit, in distinguishing *McDon-* *ough* as involving a failure to respond to a question directly asked, found that the prospective jurors were not asked on *voir dire* about their relations with "former" law enforcement officers. The circuit court declined to "put upon the jury the duty to respond to questions not posed." *Id.*

himself on *voir dire* is without merit. *See Clarkson Co. Ltd. v. Shaheen,* 660 F.2d 506, 514 (2d Cir.1981) (affirmance of a district court's denial of a motion for new trial, which was grounded in part on juror misconduct, where there "was no reason to believe that the juror had not responded properly" on *voir dire* ), *cert. denied,* 455 U.S. 990, 102 S.Ct. 1614, 71 L.Ed.2d 850 (1982).

Plaintiffs' failure to prove the first part of the two-part *McDonough* test is sufficient reason to deny their new trial motion. *See, e.g., Greenwood v. McDonough Power Equipment, Inc.,* 731 F.2d 690, 698 (10th Cir.1984) (McKay, J., concurring) (on remand from the Supreme Court, the circuit court adopted the *McDonough* two-part test, and held that the first part of the test was not met inasmuch as counsel conceded that the juror, in remaining silent, honestly answered the question on *voir dire* ); *Hard v. Burlington Northern R.R.,* 618 F.Supp. at 1466–67 (notwithstanding juror's failure to disclose on *voir dire* that he had been employed by defendant, absent plaintiff's showing that the juror failed to honestly answer the question about employment with defendant, plaintiff's motion for a new trial was denied). However, were it assumed that the *voir dire* question about family members' involvement in law enforcement required Juror 11's response and were it assumed that Juror 11 chose not to answer the question, plaintiffs fail to prove the second part of the *McDonough* test. That is, plaintiffs fail to show "that a correct response would have provided a valid basis for a challenge for cause." *McDonough,* 464 U.S. at 556, 104 S.Ct. at 850.[19]

During the jury selection *voir dire* in this case, Juror 11, as one of many prospective jurors, was asked numerous questions designed to expose any actual bias or implied bias on his part. The questions sought to expose a bias for or against police officers and to expose an inability to fairly and impartially decide this case. Juror 11 did not respond affirmatively to any question that would give reason to challenge his impartiality. Considering Juror 11's assurances of impartiality at jury selection in addition to his assurances at the *voir dire* hearing investigating his retention of impartiality following his contact with a third-party, there is no basis to find that Juror 11 was biased in either parties' favor.

Plaintiffs boldly contend that "had the Court known of [Juror 11's] failure to reveal the fact that he had relatives who were policemen, [Juror 11] would have been excused for cause." Plaintiffs' Reply Memorandum at 2. An analysis of the manner in which the court handled challenges for cause at jury selection and a review of which prospective jurors plaintiffs chose to challenge for cause show the inaccuracy of plaintiffs' contention.

Had Juror 11 disclosed that his relatives including a cousin were police officers and had plaintiffs elected to challenge him for cause, the challenge would have been denied. At the first jury selection for the other section 1983 case, plaintiffs' counsel in that case challenged Member 28 for cause on the basis of her social relationship with police officers and her deceased grandfather's former employment as a police officer. The challenge was denied and Member 28 was not excused for cause. In selecting a jury in this case, plaintiffs were successful in challenging two prospective jurors for cause. The first successful challenge was of Member 34 who admitted a difficulty with being impartial and who had been excused for cause in the first jury selection. Plaintiffs barely succeeded in their second challenge for cause. Plain-

---

**19.** The *McDonough* Court stated the second part of the test without discussing its application. Since *McDonough,* the Court of Appeals for the Eleventh Circuit has applied this second part as requiring a showing of actual bias. *See United States v. O'Neill,* 767 F.2d 780, 785 (11th Cir. 1985); *United States v. Perkins,* 748 F.2d at 1532. However, there is some authority which might warrant a new trial where juror bias can be implied from the circumstances of a particular case. *See McDonough,* 464 U.S. at 556–57, 104 S.Ct. at 850 (Blackmun, J., concurring); *Phillips* 455 U.S. at 221–25, 102 S.Ct. at 948–50 (O'Connor, J., concurring); *United States v. Howard,* 752 F.2d 220, 224–25 (6th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985).

tiffs challenged Member 45 on account of his continuing membership in a police fraternal organization. The court acknowledged that it was being "liberal" in accepting plaintiffs' challenge for cause despite the member's assurance of impartiality.

A comparison of the accepted challenge to Member 45 for cause and a hypothesized challenge to Juror 11 for cause reveals that a challenge of Juror 11 would have been rejected. Bias in favor of the police might be implied from Member 45's continued association with a police fraternal organization. However, as the court itself indicated, the excusal of Member 45 for cause was a close question. The implied bias of Member 45 is substantially different from a speculated bias of Juror 11 due to his having relatives who are employed as police officers. Plaintiffs' own characterization of Juror 11 having relatives on a police force is that it "could be indicative of probable bias." Plaintiffs' Memorandum at 12. While plaintiffs' suspicion of Juror 11's bias may have prompted their peremptory challenge of him, their suspicion is insufficient to provide a valid basis to challenge the juror for cause.

Indeed, had plaintiffs known about Juror 11's relatives at jury selection their conduct during jury selection indicates that they would not have challenged Juror 11 for cause. Plaintiffs elected not to challenge for cause the two prospective jurors, Member 28 and Memher 42, who indicated that members of their immediate family had been law enforcement officers. Specifically, plaintiffs did not challenge Member 42 who disclosed that his brother had been a police officer. See, e.g., Federal Crop Ins. Corp. v. Hester, 765 F.2d 723, 726 (8th Cir.1985) (a new trial motion, based on a juror's non-disclosure at voir dire that he had a farming background, was properly denied where three prospective jurors who answered affirmatively to farm related questions ultimately became jurors).

Understandably, plaintiffs have not argued that Juror 11's failure to affirmatively respond to the question on voir dire prejudiced their right of peremptory challenge, entitling them to a new trial. That argument was specifically rejected in McDonough. The fact that plaintiffs used two of their three peremptory challenges to exclude the two prospective jurors who disclosed that members in their immediate family had been law enforcement officers, and, therefore, would have used a third peremptory challenge to exclude Juror 11, is insufficient reason to grant a new trial.

In announcing its two-part test to serve the important end of finality, the Supreme Court in McDonough implicitly held that in juror non-disclosure cases the issue is not whether a juror's non-disclosure prejudiced a litigant's right to exercise a peremptory challenge. McDonough, 464 U.S. at 555, 104 S.Ct. at 849 (A new trial is not required "simply to recreate the peremptory challenge process because counsel lacked an item of information which objectively he should have obtained from a juror on voir dire examination."). Rather, where a juror fails to honestly answer a material question, the issue is whether the correct response to that question would have provided a valid basis for a challenge for cause. Id. at 556, 104 S.Ct. at 850.

An important aspect in this case which should not be overlooked is that plaintiffs were provided an opportunity to question Juror 11 on voir dire when the jury deliberations were temporarily suspended. Plaintiffs heard Juror 11's frank responses on voir dire, including the references to his relatives being police officers. As discussed earlier in the context of Juror 11's contact with a third-party, plaintiffs eagerly awaited a favorable verdict when they were under the impression one was moments away. The potential jury bias issue was not raised until a defendants' verdict was returned despite plaintiffs' counsel having heard Juror 11's statements. The record of the chambers voir dire of Juror 11 amply demonstrates the juror's willingness and capability to follow the law and render an impartial verdict on the facts and evidence. Under these circumstances, plaintiffs should not be allowed to gamble on a verdict, and then, after they lose, be

given a new trial. They could have raised the issue of Juror 11's failure to disclose his having relatives in law enforcement before Juror 11 was permitted to resume deliberations with the other jurors. *See United States v. Diaz-Albertini,* 772 F.2d 654, 657 (10th Cir.1985); *Stanczak v. Pennsylvania R. Co.,* 174 F.2d 43, 49 (7th Cir. 1949).

Plaintiffs rely exclusively on a 1981 decision by the Court of Appeals for the Sixth Circuit in support of their argument that Juror 11's non-disclosure deprived them of an impartial jury. *See* Plaintiffs' Memorandum at 12, *relying on McCoy v. Goldston,* 652 F.2d 654 (6th Cir.1981). *McCoy* involved a juror who remained silent at *voir dire* when asked as a prospective juror whether any "close friends or relatives" were involved in law enforcement even though her son was completing training as a parole officer. The record indicates that the juror later informed other jurors about her son's training, but cautioned the jurors not to disclose the information. *McCoy,* 652 F.2d at 656. On appeal, the Sixth Circuit found this evidence of juror non-disclosure sufficient to establish a *prima facie* case of deliberate concealment and reversed a district court's denial of a post-trial hearing. The case was remanded for a post-trial hearing to examine the juror and to determine whether a new trial must be granted. *Id.* at 659-60. Although the circuit court did not find the evidence of juror bias sufficient to order a new trial, it held that a new trial is warranted on the trial court's finding of either actual bias "where the undisclosed information would have resulted in the juror's disqualification for cause" or implied bias "when a juror deliberately concealed information or gave a purposefully incorrect answer." *Id.* at 659.

Aside from whether *McCoy*'s implied juror bias standard for granting a new trial survived *McDonough, see McDonough,* 464 U.S. 558, 104 S.Ct. at 851 (Brennan, J., concurring) (citing *McCoy* with approval); *United States v. Howard,* 752 F.2d 220,

224-25 (6th Cir.) (where the court did not decide whether *McDonough* and *Phillips* overruled *McCoy*), *cert. denied, Shelton v. United States,* —— U.S. ——, 105 S.Ct. 3506, 87 L.Ed.2d 636 (1985); *Federal Crop Ins. Corp. v. Hester,* 765 F.2d at 726 n. 4, *McCoy,* unlike the case now before this court, involved a juror's deliberate concealment of information at *voir dire.* There are no facts in the record to support a finding that Juror 11 deliberately concealed information at *voir dire,* much less to provide a basis for a finding that Juror 11 was impliedly biased against plaintiffs. Nothing in the record even suggests that Juror 11 intentionally withheld information at *voir dire.* In *McCoy,* the juror's failure to disclose a potential bias involved a mother and son relationship. As exemplified by the answers of three prospective jurors in this case that their brother, son, or grandfather had been or were police officers, a prospective juror is most likely aware that a member of their immediate family is or was involved in law enforcement. Juror 11's relatives, including a cousin, were police officers. Those relationships, unlike the mother and son relationship in *McCoy,* are neither as close nor perhaps as readily remembered as a juror's relationship with someone in his immediate family. In addition, the jury panel in *McCoy,* unlike the jury panel in this case, was specifically asked about their having "relatives" in law enforcement. That question would unquestionably call for the disclosure of the information Juror 11 did not disclose. However, the question at *voir dire* in this case concerned only family members, not relatives.

In summary, this court is keenly sensitive to its responsibility at jury selection *voir dire* in ensuring that litigants receive a complete disclosure of information about prospective jurors so that they may effectively use their peremptory challenges to exclude those prospective jurors they simply suspect are biased or prejudiced against their cause. However, now that the jury has rendered its collective judgment, it cannot be said that Juror 11's non-disclosure at

*voir dire* deprived plaintiffs of a trial by an impartial jury. Plaintiffs fail to satisfy both parts of the two-part test set forth by the Supreme Court in *McDonough;* that is (1) that Juror 11 failed on *voir dire* to honestly answer the material question whether anyone close to him, or any member of his family, was employed as a police officer or by any law enforcement agency, and (2) that had Juror 11 given a correct response by disclosing that he had relatives who were police officers, plaintiffs would have had a valid basis to challenge him for cause. At most, Juror 11's failure to affirmatively respond was an inadvertent concealment of information which would not have provided plaintiffs with a valid challenge for cause. Therefore, a new trial is not warranted.

### CONCLUSION

In view of the foregoing, the two instances of purported juror misconduct did not deprive plaintiffs of their right to a trial by an impartial jury. Thus, plaintiffs are not entitled to a new trial. Although a post-trial hearing was not requested, such a hearing on the issue of juror prejudice or bias would be pointless in view of the thorough *voir dire* examination of the juror that amply shows an absence of any juror prejudice or bias. *See McDonough,* 464 U.S. at 556–57, 104 S.Ct. at 850 (Blackmun, J., concurring).

The parties, counsel, the jurors, and the court invested considerable resources and time during the six days of trial. Although the trial was less than perfect due to unexpected occurrences beyond the control of the court, counsel, or the parties, it was fair. The jury's collective judgment finding defendants not liable for alleged civil rights and state-law violations represents the jury's careful and impartial consideration of the evidence and adherence to the instructions on the law. Justice having been served, the jury's verdict will stand.

Accordingly, plaintiffs' motion for a new trial is denied in all respects.